STATE OF NEW MEXICO
COUNTY OF RIO ARRIBA
FIRST JUDICIAL DISTRICT COURT

T.G.[1],

          Plaintiff,

v.

THE BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF RIO ARRIBA; RIO ARRIBA
COUNTY SHERIFF JAMES LUJAN; and
RIO ARRIBA COUNTY SHERIFF'S DEPUTY
LEON GALLEGOS,

          Defendants.

No.D-117-CV-2019-00514
Case assigned to Lidyard, Jason

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, BATTERY AND LOSS OF CONSORTIUM

COMES NOW, Plaintiff T.G., through his attorneys, Kennedy Kennedy & Ives, PC, and

brings this complaint under 42 U.S.C. Section 1983 for civil rights violations and the New

Mexico Tort Claims Act for battery and loss of consortium, and alleges the following causes of

action against the Defendants:

## PARTIES, JURISDICTION, AND VENUE

1.     T.G. is a corrections officer at the Rio Arriba County Adult Detention Facility located in

the city of Tierra Amarilla and a resident of Rio Arriba County in the State of New

Mexico.

2.     Sheriff James Lujan ("Sheriff Lujan") is the Sheriff of Rio Arriba County in the State of

New Mexico. He is sued in his individual and official capacity.

---

[1] Plaintiff T.G. is a survivor of sexual battery and as thus is identified herein only by his initials. Plaintiff's counsel will provide the Court and all counsel with an un-redacted copy of this Complaint as well as a reference list correlating initials with full names.



3.    Deputy Leon Gallegos ("Deputy Gallegos") is a deputy with the Rio Arriba County Sheriff's Office in the State of New Mexico. He is sued in his individual capacity.

4.    There is no familial relationship between T.G. and Deputy Gallegos.

5.    Rio Arriba County is a municipality in the State of New Mexico represented by the governmental entity Board of County Commissioners of the County of Rio Arriba ("Defendant County").

6.    Defendant County is responsible for the policies, customs, and practices of the agencies of the County, including its employees.

7.    Defendant County assumes the risks incidental to the maintenance, training, supervision, and employment of a law enforcement agency.

8.    Jurisdiction and venue are appropriate in Rio Arriba County pursuant NMSA 1978, § 38-3-1 (General Jurisdiction and Venue).

## FACTUAL ALLEGATIONS

### A. Factual Support for the Grossly Reckless Conduct of Deputy Gallegos

9.    On or about June 3, 2019, Deputy Gallegos drove his patrol unit onto the property of the detention center in Tierra Amarilla. (*See* Video of Taser X2 Deployment at 9:32:23-32, attached hereto as **Exhibit 1**)

10.   Deputy Gallegos honked the horn in his patrol unit to get onto the property.

11.   After Deputy Gallegos entered onto the property, County Correctional officers T.G. and Terrance Garcia went out to assist him.

12.   When T.G. approached the Deputy's patrol unit, he said to Deputy Gallegos, in an offhand manner: stop honking your horn at my jail.

13.   Deputy Gallegos responded: this isn't your jail.

2

14. Deputy Gallegos then pulled a Taser X2 from his pants pocket. (**Exhibit 1** at 9:32:51)

15. Deputy Gallegos pointed it at T.G.'s groin and shot him in the genitals. (**Exhibit 1** at 9:32:52)

16. T.G. immediately fell to the ground in excruciating pain. (**Exhibit 1** at 9:32:53)

17. There was no "horseplay" between Deputy Gallegos and T.G. prior to the Deputy's reckless deployment of the Taser X2. (**Exhibit 1** at 9:32:39-50)

18. Deputy Gallegos intentionally deployed his Taser X2 into T.G.'s genitals.

19. No objectively reasonable officer confronting a situation where there is absolutely no need for force would have deployed the Taser X2 in so reckless a manner.

20. Defendants Sheriff Lujan and Deputy Gallegos acted with deliberate indifference to the safety of Plaintiff T.G. and others in the Rio Arriba County community when they deployed the Taser X2 without knowledge of the safe use of the Taser X2.

21. The Taser X2 has two modes: Semi-automatic and Manual mode. Semi-automatic mode being the default. (*See* Taser X2 Product Manual at p. 21, attached hereto as **Exhibit 2**)

22. The Taser X2 automatically uses probe-deployment when the trigger is pulled in Semi-automatic mode. By pressing and holding the Taser's ARC switch, energy is applied to the already deployed cartridge without deploying unexpended cartridges. (**Exhibit 2**, at p. 20)

23. In Manual mode, however, pulling the trigger does not advance cartridge selection. In this mode the ARC switch has a different function. It is used to select cartridges prior to deployment. (**Exhibit 2**, at pp. 21-22)

24. The Taser X2 used by Deputy Gallegos was fired in the default Semi-automatic probe-deployment mode.

25. The default mode has two cartridges with 15 to 35 feet of wire and two barbs at the end of each cartridge. (**Exhibit 2**, at p. 4)

26. Semi-automatic probe-deployment mode is programmed to deliver electricity in five-second shocks. (**Exhibit 2**, at pp. 15-16)

27. When Deputy Gallegos deployed his Taser X2, both barbs penetrated T.G.'s pants causing the device to deliver 50,000 volts of electricity to his genitals.

28. The groin area is a no-strike zone according to the manual. (**Exhibit 2**, at p. 41)

29. The result of using a Taser X2 in a no-strike zone is the increased risk of death or serious bodily injury.

30. When Deputy Gallegos deployed his Taser X2, Sheriff Lujan had not trained him on the safe use of the Taser X2.

31. T.G. has suffered physical injuries from Taser X2 shock to his genitals and emotional injuries which arise from the physical injuries to his genitals.

32. T.G. has suffered severe mental anguish and emotional injuries, including the symptomology of Post-Traumatic Stress Disorder ("PTSD"), from the pain of the shock to the genitals, workplace and public humiliation from the viral videotape of the subject incident, and from the interference of intimacy caused by the shock to his genitals.

**B. Factual Support for Sheriff Lujan's Deliberately Indifferent Training and Supervision of Deputy Gallegos and other Deputies Use of Taser X2**

33. In or around March 2019, the Rio Arriba Country Sheriff's Office purchased new Tasers, upgrading to the Taser X2 model.

34. Each Taser model has significant differences and it is vital to be trained on each particular model. (**Exhibit 2**, at p. 1)

35. Sheriff Lujan issued the Taser X2 to his deputies, including Deputy Gallegos, before he

trained them on the upgraded model. (*See* Plaintiff's **Exhibit 3,** attached hereto, as KOB TV Story, https://www.kob.com/albuquerque-news/4-investigates-rio-arriba-deputies-were-not-trained-to-use-tasers/5394344/ at 1:18)

36. In an interview with Sheriff Lujan, KOB TV News reporter Chris Ramirez asked Sheriff Lujan "had your deputies received training on the X2 before they were being used?" **(Exhibit 3** at 1:21-25)

37. Sheriff Lujan responded, "Not that I, there may be a couple that already had been trained on the X2s, but not all the deputies." **(Exhibit 3** at 1:26-1:30)

38. Chris Ramirez then asked, "in light of what we've seen…do you think some of that may have been avoided had they received training on the X2s?" **(Exhibit 3** at 1:33-39)

39. Sheriff Lujan responded, "Yes." **(Exhibit 3** at 1:40)

40. Sheriff Lujan later admitted to Chris Ramirez that "in the future he plans on training his deputies before rolling out a new weapon." **(Exhibit 3** at 2:19-25)

41. Deputy Gallegos was not trained on the Taser X2 when he deployed his weapon to T.G.'s groin. **(Exhibit 3** at 1:26-1:30)

42. Deputy Gallegos did not receive Taser X2 training until on or about June 18, 2019.

43. After the May 10, 2019 incident, wherein Sheriff's Deputy and School Resource Officer Jeremy Barnes deployed Taser X2 prongs into the upper chest, another no strike zone, of a 14-year-old disabled boy, Sheriff Lujan received notice that his deputies, untrained on the Taser X2, were using the Taser X2 models in a reckless manner. (*See* Plaintiff's **Exhibit 4**, attached hereto, as Tort Claims Notice).

44. Even after receiving actual notice of the obvious risk, Sheriff Lujan allowed Deputy Gallegos to continue to use the Taser X2 while untrained to do so.

45. At all times relevant to this complaint, Sheriff Lujan issued the Taser X2 to his deputies, including Deputy Gallegos, and allowed untrained deputies into the field with these weapons.

## COUNT I
### FOURTEENTH AMENDMENT RIGHT TO BODILY INTERGRITY AND FOURTH AMENDMENT RIGHT TO BE FREE FROM EXCESS FORCE:
#### (Civil Rights Violations Against Deputy Gallegos)

46. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

47. Deputy Gallegos intentionally deployed his Taser X2 when absolutely no force was necessary.

48. Deputy Gallegos intentionally deployed his Taser X2 in a grossly reckless manner to a no-strike zone.

49. Deputy Gallegos's use of force was objectively unreasonable.

50. Deputy Gallegos's acts violated T.G.'s Fourth Amendment rights to be secure in his person from unreasonable search and seizures.

51. Deputy Gallegos's acts violated T.G.'s Fourteenth Amendment rights to bodily integrity under the law.

52. Deputy Gallegos acted willfully, knowingly and purposefully to deprive T.G. of his Constitutional Rights.

53. As a direct and proximate result of Deputy Gallegos's grossly reckless behavior T.G. suffered physical injuries, humiliation, indignities, and the deprivation of his civil rights.

## COUNT II
### BATTERY
#### (Deputy Gallegos and Defendant County)

54. Plaintiff hereby incorporates by reference each of the allegations set forth in the

preceding paragraphs as if re-alleged fully herein.

55. Governmental immunity is waived under NMSA 1978, § 41-4-12, which waives immunity for personal injury resulting from battery and/or constitutional violations when caused by a law enforcement officer in the scope of his duties.

56. Deputy Gallegos intended to cause harmful and offensive contact with T.G. by deploying his Taser X2.

57. Deputy Gallegos caused harmful and offensive contact with T.G. to occur by intentionally deploying his Taser X2.

58. Deputy Gallegos's harmful and offensive contact constitutes battery against T.G.

59. Deputy Gallegos acted in a grossly reckless manner in committing battery against T.G.

60. T.G. experienced damages and personal injury as a result of Deputy Gallegos's battery.

61. The Defendant County is liable under respondeat superior for the battery Deputy Gallegos committed.

62. As a direct and proximate result of Deputy Gallegos's offensive contact, T.G. suffered severe physical injuries, the full extent of which are currently unknown.

63. As a direct and proximate result of Deputy Gallegos's offensive contact, T.G. suffered PTSD, anxiety, psychosis, loss of intimacy and loss of enjoyment of life.

## COUNT III
## SUPERVISORY LIABILITY UNDER FOURTH AND FOURTEENTH AMENDMENTS
## DELIBERATE INDIFFERENCE
### (Sheriff Lujan)

64. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

65. At all times relevant to this complaint, Sheriff Lujan had actual notice that his deputies were not trained on the Taser X2.

66. Although Sheriff Lujan had actual notice that his deputies were not trained on the Taser X2 model, he issued these weapons to them anyway.

67. Sheriff Lujan in his official and individual capacity acted with deliberate indifference towards the public, including T.G., by allowing untrained deputies into the field with these weapons.

68. Sheriff Lujan's action were objectively unreasonable and deliberately indifferent.

69. As a direct and proximate result of the deliberate indifference of Sheriff Lujan, Deputy Gallegos deployed a weapon with reckless disregard for the safety of others thereby violating T.G.'s right to bodily integrity and to be free from an excessive use of force.

70. As a direct and proximate result of the deliberate indifference of Sheriff Lujan, T.G. experienced severe physical injuries, emotional distress, pain and suffering, humiliation, indignities, loss of enjoyment of life, and deprivation of his civil rights.

**COUNT IV**
**VIOLATION OF T.G.'S RIGHT TO EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(Deputy Gallegos)**

71. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

72. At all times relevant to this Complaint, T.G. enjoyed the right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

73. Other male county employees were similarly situated to T.G., as he is a male county employee.

74. Deputy Gallegos sexually harassed and battered T.G. while acting as a county employee.

75. Deputy Gallegos did not, however, sexually harass and batter female county employees as he did T.G.

76. Deputy Gallegos sexually harassed and battered T.G. because he is a man with male genitalia. But for his sex, male, Deputy Gallegos would not have pointed his taser at the male genitalia of T.G. and deployed it into his groin area.

77. *Oncale* clearly establishes same-sex sexual harassment between male employees as actionable. To deploy Taser X2 weapon prongs into the groin area of a male co-worker is "objectively" offensive conduct to alter the conditions of employment and thus actionable as an Equal Protection violation. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).

78. Male-on-male sexual harassment has been prohibited by the United States constitution for over twenty years.

79. Defendant Sheriff Lujan has created a work environment ripe for male-on-male sexual harassment by cultivating a culture of toxic masculinity between himself and county employees.

80. Deputy Gallegos violated T.G.'s Fourteenth Amendment right to the equal protection of the law when he used his Taser X2 to sexually batter T.G.

81. Deputy Gallegos's acts were intentional, wanton, malicious, sadistic, and in gross and reckless disregard of, or deliberate indifference to, T.G.'s constitutional rights to equal protection based on his sex, male.

82. Deputy Gallegos acted with the purpose of causing harm to T.G., and not to accomplish any legitimate goal.

### COUNT V
### MUNICIPAL LIABILITY
### (Defendant County and Sheriff Lujan in Official Capacity)

83. Plaintiff hereby incorporates by reference each of the allegations set forth in the

preceding paragraphs as if re-alleged fully herein.

84. Defendant County is liable for the actions of policy makers and law enforcement officers whom they employ or direct to act on their behalf.

85. Sheriff Lujan, in his official capacity, is an agent of Defendant County.

86. Sheriff Lujan, in his official capacity, is a policymaker.

87. Sheriff Lujan acted with deliberate indifference by issuing the Taser X2 to his deputies and allowing untrained deputies into the field with these weapons.

88. Sheriff Lujan acted with deliberate indifference when he failed to train or certify his law enforcement officers on the Taser X2 after Deputy Barnes deployed his Taser X2 into the chest of a disabled school boy.

89. Failure to train on the Taser X2 was an obvious inadequacy and directly resulted in a violation caused by Deputy Gallegos's misuse of the weapon.

90. As a direct and proximate result of the deliberate indifference of Sheriff Lujan, Deputy Gallegos was ill-equipped to use his weapon and deployed his Taser X2 in an intentional and reckless manner into the groin area of T.G.

91. Deputy Gallegos, as an agent of Defendant County, acted in a grossly reckless manner by intentionally deploying his Taser X2 to T.G.'s groin.

92. As a direct and proximate result of Deputy Gallegos's actions, T.G. suffered physical injuries, emotional distress, pain and suffering, humiliation, indignities, loss of enjoyment of life, and deprivation of his civil rights.

### COUNT VI
### LOSS OF CONSORTIUM

93. Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

10

94. Plaintiff lives together with a woman as husband and wife.

95. Plaintiff and his female partner have lived, shared life experiences and formed a deeply close relationship of mutual emotional and financial dependence.

96. As a result of the acts and omissions of Defendants, the quality of Plaintiff's sexual intimacy with his life partner has been negatively impacted for the foreseeable future.

97. As a result of the acts and omissions of Defendants, the quality of Plaintiff's relationship with his life partner has been negatively impacted by his mental and physical injuries.

98. It was foreseeable that T.G.'s intimate relationship would be harmed by the actions and omissions of Defendants.

99. As a direct and proximate result of the acts and omissions stated herein, Plaintiff has suffered physical and emotional harms and losses for the foreseeable future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court:

I.     Award compensatory damages for physical injuries, emotional distress, pain and suffering, humiliation, indignities, loss of sexual intimacy and loss of enjoyment of life;

II.    Award special damages for evaluation and therapy to treat these injuries into the foreseeable future;

III.   Award punitive damages against the Defendants sufficient to punish the individual Defendants and to deter further wrongdoing;

IV.    Award pre-judgment and post-judgment interest, costs, and expenses in bringing this action, including attorney's fees; and

V.     Any other relief the Court deems just and proper.

Respectfully submitted,

KENNEDY KENNEDY & IVES, PC

*/s/ Shannon L. Kennedy*
Shannon L. Kennedy
Joseph P. Kennedy
Laura Schauer Ives
Erin L. Chavez
*Attorneys for Plaintiff*
1000 2nd Street NW
Albuquerque, New Mexico 87102
(505) 244-1400 / F: (505) 244-1406
slk@civilrightslaw.com
jpk@civilrightslaw.com
lsi@civilrightslaw.com
elc@civilrightslaw.com



# TASER X2 CEW
## User Manual



Models 22000, 22001, 22002, 22003, T00074

 **IMPORTANT SAFETY INSTRUCTIONS**

Read all warnings and instructions. Save these instructions.

The most up-to-date warnings and instructions are available at www.axon.com

MMU0037 Rev: L

June 2019



**Exhibit 2**

# Chapter 1: Warnings

## Important Safety and Health Information

Read, understand and follow the most current product warnings, safety instructions, and training materials. All product warnings are not included in this Manual. A Product Warnings document is included with this Conducted Energy Weapon (CEW) and the most current warnings are posted on our website at www.axon.com. The most current training materials are available by contacting Axon's Training Department. Do not attempt to use this CEW until you have completed training with an Axon Enterprise, Inc. Certified TASER Instructor.

| ⚠ **WARNING!** | |
|---|---|
| 🎓 | **Complete Training First** Significant differences exist between each of the TASER CEW models. Do not use or attempt to use any CEW model unless you have been trained and certified by a Certified TASER Instructor on that particular model. |
| 📖 | **Read and Obey** Read, study, understand, and follow all instructions, warnings, information, training bulletins and relevant TASER training materials before using the TASER X2 CEW. Failure to comply with the product instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the user, force recipient, and others. |
| ⚖ | **Obey Applicable Laws** Use of CEWs must be legally justified and comply with applicable federal, state, and local laws and regulations. The decision to use a CEW in a particular manner or circumstance must follow applicable law enforcement agency Guidance. |
| | ⚠ **WARNING** Conducted Energy Weapon • Can temporarily incapacitate target. • Can cause death or serious injury. • Obey warnings, instructions and all laws. • Comply with current training materials and requirements. • See www.axon.com |

In probe-deployment mode, TASER CEWs are designed to temporarily incapacitate a person from a safer distance while reducing the likelihood of serious injuries or death. When used as directed, TASER CEWs have been found to be safer and more effective than other traditional use-of-force tools and techniques. However, it is important to remember that the use of force and physical incapacitation, by their very nature, involve risk that someone will get hurt or may even die from factors that include, but are not limited to: physical resistance, exertion, individual susceptibilities, and/or unforeseen cir-

# Chapter 2: General information

## What is the X2 CEW?

The TASER X2 CEW is a firmware upgradable, two-shot weapon manufactured by Axon Enterprise, Inc. The X2 CEW uses two replaceable Smart Cartridges containing compressed nitrogen to deploy two small probes that are attached to the X2 CEW by insulated conductive wires. The X2 CEW transmits electrical pulses along the wires and into the body which are designed to affect the sensory and motor functions of the peripheral nervous system and cause involuntary muscle contractions. The cartridges are available with various wire lengths from 15 feet to 35 feet (4.6 meters to 10.7 meters). The X2 CEW deploys the cartridges one at a time. It is possible to apply energy beyond the initial burst to a deployed cartridge without deploying the remaining cartridge. It also is possible to apply a Warning Arc display or drive-stun without deploying any of the cartridges loaded in the CEW.

The X2 CEW has an internal memory that stores the operating firmware and a record of every deployment. See *Trilogy Log* (Chapter 5) for more details. The X2 CEW's Trilogy log can be downloaded to Axon Evidence (Evidence.com) services. Those who do not have an Axon Evidence account can use Offline Evidence Sync software to download a simplified log to a local computer.

The X2 CEW has an estimated useful life of five years.

## Neuro Muscular Incapacitation (NMI)



TASER technology is designed to use electrical impulses similar to those in your body's nervous system to cause stimulation of the sensory and motor nerves. Neuro Muscular Incapacitation (NMI) occurs when a CEW is able to cause involuntary stimulation of both the sensory nerves and the motor nerves. It is not dependent on pain and can be effective on subjects with a high level of pain tolerance.

Previous generations of stun guns primarily affected the sensory nerves only, resulting in pain

The CID below shows the Semi-Automatic mode icon and a battery that is 41–60 percent full. The first cartridge has been deployed, and the second cartridge is selected.



The CID below shows the Semi-Automatic mode icon and a battery that is 81–100 percent full, loaded with 25- and 35-foot cartridges. The 25-foot cartridge is selected; it will be deployed when the trigger is pulled.



The CID below shows the Semi-Automatic mode icon, with two 25-foot training cartridges, and a battery that is 21–40 percent full. The left cartridge is selected.



The CID below shows the Semi-Automatic mode icon, with one expended cartridge, one 25-foot cartridge that is currently selected, a battery at 41–60 percent capacity, and an APPM battery pack installed.



The CID below shows the manual mode icon, with one 25-foot cartridge that is currently selected, a 35-foot cartridge, a battery at 81–100 percent capacity, and a TASER CAM HD recorder installed.



The CID shows the Semi-Automatic mode icon, one 25-foot cartridge that is currently selected, a 35-foot cartridge, a battery at 81–100 percent capacity, and an SPPM battery pack installed.



## Probe-Deployment Mode

When the X2 CEW trigger switch is pulled and then released, it delivers an automatic 5-second Precision Shaped Pulse deployment. The cycle continues for five seconds (unless the safety switch is shifted to the down [SAFE]) position during the cycle).

In probe-deployment mode, the CID display shows the deployment cycle duration for the most recent cartridge deployed. If you deploy a second Smart Cartridge a few seconds later (while the first cycle is running), the CID will stop showing data for the first cartridge (though the first cartridge will still complete its deployment cycle) and start displaying the deployment cycle duration for the second cartridge.

**The cycle can be stopped at any time by shifting the safety switch to the down (SAFE) position.** If both cartridges are cycling and the safety switch is moved to the down (SAFE) position, then the electrical cycle will stop for BOTH cartridges.

## Spark Duration

The CID displays a count indicating how many seconds the deployment cycle lasts. The CEW will count up from the number 1 up to 99. At 99 seconds, the count will restart at one.



## ARC switch

If you press the ARC switch, the CID will display the deployment cycle duration with the operating mode icon. The CEW will count up. In the CID shown below, the Warning Arc display has been in effect for three seconds. The Semi-Automatic mode icon displays, and the battery is 81–100 percent full.



Semi-Automatic Mode — Count — Battery Capacity 81-100%

# Top LASER

The top LASER installed in the X2 CEW is oriented with the mechanical sights. At 15 feet (4.6 m), the aiming point is aligned to the approximate trajectory of a 25-foot (7.6 m) cartridge's top probe.

# Bottom LASER

At 15 feet (4.6 m), the bottom LASER is aligned to the approximate trajectory of a 25-foot (7.6 m) cartridge's bottom probe. The bottom LASER only appears when the selected bay contains a live cartridge or a resettable training cartridge.

**The bottom LASER is not aligned to the trajectory of a 35-foot (10.7 m) cartridge.**



Seconds Elapsed in
Cycle for the First
Cartridge (3)

Second Cartridge
Not Yet Deployed

Battery Capacity
81-100%

The X2 CEW energizes the first cartridge. Releasing the trigger automatically selects the next cartridge while the first cartridge is deploying.

If you have engaged a target and contact is good, pressing and holding the ARC switch will apply energy to both cartridge bays but will not deploy an unexpended cartridge. This allows you to apply cycles to a continually resisting subject, if needed, without expending the remaining cartridge.

2   Pull the trigger to deploy the second cartridge.



Two Deployed Cartridges



Seconds Elapsed in
Cycle for the Second
Cartridge

Battery Capacity
81-100%

When both the first and second cartridges are energized each of the two firing bays will run for approximately five seconds on its own counter. If the second cartridge is deployed while the first cartridge is still energized, the first cartridge's cycle will end before the second cartridge's cycle ends. Therefore, to energize both cartridge bays, press the ARC switch. If the ARC switch is held down after the second cartridge's cycle ends, both cartridge bays will continue to cycle.

**Note:** If the probes from cartridge bay #1 are in subject A and the probes from cartridge bay #2 are in subject B, then pressing the ARC switch will energize both cartridge bays and both subject A and B will receive the effects of the CEW.

Shifting the safety switch to the down (SAFE) position stops the cycle for all cartridge bays.

**Note:** Do not pull the trigger and press the ARC switch simultaneously. The trigger will override the ARC switch.

# Manual Mode

Depending on your agency's settings, your X2 CEW will function in either the Semi-Automatic or Manual firing mode. If your CEW is configured to function in the Semi-Automatic mode, see *Semi-Automatic Mode*.

**Note:** The Semi-Automatic mode is the default method of operation. Manual mode can be configured only through Axon Evidence services.

## Arc display/Re-energize/Cartridge advance (ARC) Switch Functions

The trigger and ARC switch work differently in the Manual mode than they do in the Semi-Automatic mode. In Manual mode, pulling the trigger does not advance cartridge selection. Instead, the ambidextrous ARC switch is used to select the Smart Cartridges. By default, the left cartridge (or the first available cartridge, from left to right) is selected automatically. (This is the left side from your perspective, while pointing the CEW.) Pulling the trigger deploys the left cartridge. Pressing and releasing (quickly tapping once) the ARC switch selects the next available cartridge. An additional trigger pull is required to deploy the next selected cartridge. When a live cartridge is still available, the CEW will not select a deployed cartridge.

A sustained press of the ARC switch for approximately ½ second or more energizes the front of the cartridges without deploying (discharging) them. See *Warning Arc Display* (Chapter 4) for more information. If you have already deployed cartridges, pressing the ARC switch and holding it down

supplies energy to the deployed cartridges without deploying any un-discharged cartridges.

If you have engaged a target with the first cartridge and contact is good, you can apply additional cycles to a continually resisting subject, if needed, without deploying the remaining cartridge. Holding the ARC switch down continually will arc the CEW until the ARC switch is released or the PPM is depleted, whichever happens first.

Because the ARC switch is ambidextrous, you can press from either side as you hold the CEW in a 2-handed grip.

## Trigger Functions

In Manual mode, after the first cartridge is deployed, pulling the trigger again will apply additional energy through the wires to the probes. Unlike with the Semi-Automatic mode, this will not deploy additional cartridges. It is recommended to always press and hold the ARC switch when you need to re-energize a deployed cartridge without expending the additional cartridge (in both Manual and Semi-Automatic mode).

After deploying a cartridge, you can press and release (quickly tap once) the ARC switch to select another cartridge to use. You do not have to wait for the cycle of the first cartridge to end before deploying a new cartridge.



First Available Cartridge Selected

Manual Mode

Other Cartridge Loaded in the CEW

Battery Capacity 61-80%

1   Pull the trigger switch to deploy the first cartridge.

# Recommended Drive-Stun Areas for Maximum Effect

Use the CEW pursuant to your agency's policies and procedures. For maximum effectiveness, drive the X2 CEW into the highlighted green areas as outlined below:



Suggested pressure points are highlighted in the green areas. Use care when applying the drive stun to the neck or groin (yellow areas – users should only target these areas when they are defending themselves against a violent attacker). Stay away from the trachea and back of the neck. The trachea is soft tissue and could easily be crushed. The cervical portion of the spine is very sensitive to pressure. Also, care should be taken when applying a drive stun to the pelvic triangle to avoid the possibility of crushing the testicles.

**Refer and adhere to your department's policy and training regarding drive-stuns in these and other sensitive areas.**



May 23, 2019

*Via USPS Mail & Email to:*
Rio Arriba County Clerk's Office
Attn: Linda J. Padilla
1122 Industrial Park Rd.
Espanola, NM 87532
ljpadilla@rio-arriba.org

*Via USPS Mail & Email to:*
Espanola Public Schools
Attn: Superintendent Bobbie J. Gutierrez
116 Calle Espinoza
Espanola, NM 87532
bobbie.gutierrez@k12espanola.org

Re: *Tort Claims Act Notice regarding A.M.*

Greetings:

This letter is written notice of tort claims against public entities, pursuant to the New Mexico Tort Claims Act. In addition to serving as a tort claim notice under § 41-4-1 et. seq., this letter also serves as notice to **preserve all records** related to this incident, **as they existed at the time of the incident**, including, but not limited to: photographs, videotapes, reports, notes, memoranda and correspondence related in any way to investigations of the incidents; transcripts, cassette tape or videotapes of any interviews conducted related to the incidents; and any other evidence, reports, notes, correspondence or memoranda related in any way to the incidents. The destruction of any of the above items will result in our pursuing a case against Rio Arriba County, Rio Arriba County Sheriff's Office, Espanola Public Schools and/or Espanola Valley High School based upon spoliation of evidence.

A.M. is a fifteen-year-old student attending Espanola Valley High School. On May 10, 2019, while under the care of Espanola Valley High School, A.M. was tased by a Rio Arriba County sheriff's deputy on school property. A.M. suffered various injuries.

Claims against Rio Arriba County, Rio Arriba County Sheriff's Office, Espanola Public Schools and Espanola Valley High School include, but are not limited to, unreasonable seizure,

**KENNEDY KENNEDY & IVES** ✦ WWW.K2ILAW.COM
1000 2ND ST NW ✦ ALBUQUERQUE, NM 87102 ✦ P) 505-244-1400 F) 505-244-1406
JOSEPH P. KENNEDY ✦ SHANNON L. KENNEDY ✦ LAURA SCHAUER IVES ✦ ADAM C. FLORES

**Exhibit 4**



negligent training, and/or excessive force by a law enforcement officer and any claim arising under NMSA 41-4-12.

We intend to file suit. If you or your risk managers would like to meet to discuss settlement of this case before then, please contact my office. Should you require any further details to investigate these claims, I am available to discuss this matter with you.

Respectfully Submitted,

KENNEDY KENNEDY & IVES

Joseph P. Kennedy
Shannon L. Kennedy
Attorneys at Law
1000 2nd Street NW
Albuquerque, NM 87102
505-244-1400
jpk@civilrightslaw.com
slk@civilrightslaw.com