## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

T.G.,

      **Plaintiff,**

    **vs.**                                 Civ. No. 19-1116 JFR/JHR

**BOARD OF COUNTY COMMISSIONERS
OF COUNTY OF RIO ARRIBA, RIO ARRIBA
COUNTY SHERIFF JAMES LUJAN and
RIO ARRIBA COUNTY SHERIFF DEPUTY
LEON GALLEGOS,**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on Defendants' Joint Motion for Summary Judgment (Qualified Immunity Raised), filed May 1, 2020.  Doc. 21.  The Court, having considered counsel's arguments, the record, and the relevant law, FINDS that the motion is well taken in part and is **GRANTED IN PART.**

## I.  INTRODUCTION

    On June 3, 2019, Plaintiff, a corrections officer at the Rio Arriba County Adult Detention Facility ("Detention Facility"), opened the secured gate at the Detention Facility to Rio Arriba County Sheriff Deputy Leon Gallegos ("Defendant Gallegos"), who was there to transport detainees to court.  After entering the Detention Center and following a brief verbal exchange with Plaintiff, Defendant Gallegos reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger deploying darts into Plaintiff's groin.  On October 22, 2019, Plaintiff filed suit

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 5, 9, 11.)

against Defendants in state court alleging (1) violations of his Fourth Amendment right to be free from excessive force and unreasonable seizure and Fourteenth Amendment right to bodily integrity against Defendant Gallegos; (2) battery against Defendant Gallegos and Defendant Rio Arriba County; (3) supervisory liability and deliberate indifference under the Fourth and Fourteenth Amendments against Defendant Sheriff James Lujan ("Defendant Lujan"); (4) violation of Plaintiff's right to equal protection of the law under the Fourteenth Amendment against Defendant Gallegos; (5)  municipal liability against Defendant Rio Arriba County and Defendant Lujan in his Official Capacity; and (6) loss of consortium.  Doc. 1-1.  Defendants removed the case to this Court on December 2, 2019, based on original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Doc. 1 at 2-3.

Defendants filed the summary judgment motion presently before the Court on May 1, 2020. Defendant seeks summary judgment based on qualified immunity and/or on the merits of all claims asserted in the lawsuit.  Plaintiff filed a response on June 8, 2020 (Doc. 31), and Defendants filed a reply on June 25, 2020 (Doc. 38).

## II.  LEGAL STANDARDS

### A.    Summary Judgment

A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] ... which it believes

demonstrate the absence of a genuine issue of material fact." *Catrett*, 106 S. Ct. at 2552 (internal quotation marks omitted); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). Once the movant meets this burden, the non-moving party is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986); Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (internal citations omitted); *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The trial judge is not to weigh the evidence to determine the truth of the matter, but instead must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 106 S. Ct. at 2512. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 2510. To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Catrett*). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Catrett*, 106 S. Ct. at 2552 (quoting Fed. R. Civ.

P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat

summary judgment but rather must produce some specific factual support of its claim. *See*

*Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988);

*Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp*., 106 S. Ct.

1348, 1356 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view

the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all

reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp.

1277, 1281 (D. Kan. 1997). If there is no genuine issue of material fact in dispute, then a court

must next determine whether the movant is entitled to judgment in its favor as a matter of law.

*See, e.g., Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

> **B.**    **Under Color of Law**

42 U.S.C. § 1983 provides in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and the laws shall be liable to the party injured in an action at law, suit
> in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In any § 1983 action the initial inquiry must focus on whether the two

essential elements to a § 1983 action are present:  (1) whether the conduct complained of was

committed by a person acting under color of state law; and (2) whether this conduct deprived a

person of rights, privileges, or immunities secured by the Constitution or laws of the United

States. *Parratt v. Taylor*, 101 S. Ct. 1908, 1913 (1981), *overruled on other grounds by Daniels*

*v. Williams*, 106 S. Ct. 662 (1986).  "[B]efore a defendant may be held liable under [42 U.S.C. §

1983], that defendant must first *possess* power by virtue of state law, then *misuse* that power in a

way that violates federal constitutional rights."  *Christian v. Belcher,* 888 F.2d 410, 414 (6th Cir.

1989) (emphasis in original).  The "under color of state law" requirement is a jurisdictional

requisite for a § 1983 action.  *Polk County v. Dodson*, 102 S. Ct. 445 (1981).  A defendant in a

§ 1983 suit acts under color of state law when he abuses the position given him by the state while

exercising responsibilities pursuant to state law.  *West v. Atkins,*108 S. Ct. 2250, 2255 (1988)

(citation omitted); *Beedle v. Wilson,* 422 F.3d 1059, 1074 (10th Cir. 2005).

 The ultimate issue in determining whether a person is subject to suit under § 1983 is

whether the alleged infringement of federal rights is fairly attributable to the State.  *Rendell-*

*Baker*, 457 U.S. 830, 838, 102 S.Ct. 2764 (quoting *Lugar v. Edmondson Oil Co., Inc*., 457 U.S.

922, 937, 102 S.Ct. 2744 (1982))).  The "fair attribution" question, in turn, has two components.

> First, the deprivation must be caused by the exercise of some right or privilege
> created by the State or by a rule of conduct imposed by the state or by a person for
> whom the State is responsible . . . .  Second, the party charged with the
> deprivation must be a person who may fairly be said to be a state actor.  This may
> be because he is a state official, because he has acted together with or has
> obtained significant aid from state officials, or because his conduct is otherwise
> chargeable to the State.  Without a limit such as this, private parties could face
> constitutional litigation whenever they seek to rely on some state rule governing
> their interactions with the community surrounding them.

*Luga*r, 457 U.S. at 937, 102 S.Ct. 2744.  These two questions, which at times may "collapse into

each other when the claim of a constitutional deprivation is directed against a party whose

official character is such as to lend the weight of the State to his decisions," are not the same.  *Id.*

When an actor is a law enforcement official, the second element is satisfied, and so whether his

action is fairly attributable to the state depends on the answer to the first question – whether his

actions are "caused by the exercise of some right or privilege created by the State," *id.*, or

whether, in undertaking them, he "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer [was] clothed with the authority of state law,'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031 (1941)).  Clearly then, it is well settled that "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."  *West*, 487 U.S. at 50, 108 S.Ct. 2250.

It is also "firmly established that a defendant in a § 1983 suit acts under color of state law when he *abuses* the position given to him by the State."[2]  *Id.* at 49-50, 108 S.Ct. 2250 (emphasis added).  The limiting principle, however, is that "under 'color' of law means under 'pretense' of law.  Thus, acts of officers in the ambit of their personal pursuits are plainly excluded."  *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031 (plurality opinion).  "Manifestations of such pretended authority may include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute involving others pursuant to a duty imposed by police department regulations."  *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994) (citation omitted).  Courts look for such "indicia of police authority" although the indicia must be considered together in context to determine whether an officer purported to act under pretense and therefore under color of law, rather than as per se determinants that he did so.

_____

[2] In *Stringer v. Dilger*, 313 F.2d 536, 541 (10th Cir. 1963), the Tenth Circuit provided some examples of actions taken under color of state law and held to be deprivations of rights guaranteed by the Constitution and laws of the United States: (1) Illegal search and seizure, unlawful arrest and detention without a warrant or arraignment by local officers, *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473 (1961); (2) illegal arrest and assault without cause resulting in death, *Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961); (3) illegal arrest and seizure, refusal to permit consultation with an attorney, physical abuse, incarceration in jail and refusal to inform the person as to what crime she was charged with committing, *Davis v. Turner*, 197 F.2d 847 (5th Cir. 1952); (4) apprehension by local officers of an individual who was badly beaten, intimidated and imprisoned by them without ever being taken before a committing magistrate or tribunal which would afford him due process of law, *Koehler v. United States*, 189 F.2d 711 (5th Cir. 1951) (Criminal prosecution under criminal civil rights statutes); (5) the use of threats, intimidation and questioning to force an individual accused of crime to change his plea of not guilty to guilty*, Lewis v. Brautigam*, 227 F.2d 124 (5th Cir. 1955), 55 A.L.R.2d 505; and (6) unlawful arrest and detention without preferring charges against plaintiff and failing to provide urgently needed medical attention, *Coleman v. Johnston*, 247 F.2d 273 (7th Cir. 1957).

*Id.* at 817-18.  Such factors often deemed relevant but not per se determinative include: whether the defendant officer was on duty; whether the officer was pursuing purely private motives by means of exercising state authority, or in an "interaction with the victim [that was] unconnected with his execution of official duties" and therefore not "under color of law"; whether the officer's actions were related to his job as a police officer; whether the officer's actions occurred within his jurisdiction; whether the officer identified himself as a police officer; whether he wore police clothing or showed a badge; whether he used or carried a service weapon or used a police car or other police equipment; and whether the officer attempted to arrest the victim. *Washington-Pope v. City of Philadelphia*, 979 F. Supp. 2d 544, 554 (E.D. Pa. Oct. 22, 2013) (citations omitted).

But "[w]hile certain factors will clearly be relevant" in any given case – "for example, a police officer's garb, an officer's duty status, the officer's use of a service revolver, and the location of the incident – these factors must not be assessed mechanically."  *Id.* (citing *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999); *see also Strange v. Porath*, No. 96-2072, 1996 WL 733766, at *3 (10th Cir. Dec. 24, 1996) ("When courts have applied the color of law requirement to the conduct of off-duty police officers, a single factor is rarely determinative. Rather, the courts have tended to use a totality of the circumstances approach in their formulation."); *David v. City of County of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) ("The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer' attire, the location of the action or whether or not the officer acts in accordance with his or her duty.").  The fact that a police officer purports to act with official authority in one moment is not necessarily sufficient for a determination that he did so in the next.  *Washington-Pope*, 979 F. Supp. 2d at 557 (citations omitted).  Further, the question is not whether an officer happened

coincidentally to use tools at his fingertips because he was a police officer, but whether he purported to exercise state authority in his actions. *Id.* at 557-58. A number of courts have explained that "[t]o determine if an officer was depending upon the 'cloak of the state's authority' to commit the alleged acts, courts ask whether the officer's actions are consistent with actions generally taken by a police officer." *Id.* at 561 (citations omitted).

Every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation. *See Carter v. Buscher,* 973 F.2d 1328, 1332 (7th Cir. 1992). Some conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994); *Wyatt v. Cole,* 994 F.2d 1113, 1117–18 (5th Cir. 1993) (the wrongful act of an individual unsupported by any such authority, is simply a private wrong, or a crime of that individual. . . ."). "It is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Jojola v. Chavez,* 55 F.3d 488, 493 (10th Cir. 1995). Determining whether certain conduct constitutes state action "has been characterized as 'one of the more slippery and troublesome areas of civil rights litigation.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (citing *International Soc'y for Krishna Consciousness, Inc. v. Air Canada,* 727 F.2d 253, 255 (2d Cir. 1984) (*per curiam*)). As a result, the Tenth Circuit "has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case." *Id.* It has refrained from articulating a specific standard for evaluating whether a police officer is acting as a state actor, choosing instead to recognize helpful factors of consideration from other circuits. *See United States v. Cintron*, 482 F. App'x 353 (10th Cir. 2012). Whether a defendant acts under color of law "rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or

not the officer acts in accordance with his or her duty." *Id.* (quoting *David*, 101 F.3d at 1353).

Instead, the court must examine "the nature and circumstances of the [actor's] conduct and the

relationship of that conduct to the performance of his official duties." *Id.* (citation omitted); *Rall*

*v. Hobbs Mun. Sch. Dist.*, No. CV 15-0518 RB/CG, 2016 WL 10588125, at *6 (D.N.M. Mar. 16,

2016).

 "[B]efore conduct may be fairly attributed to the state because it constitutes action 'under

color of state law,' there must be 'a real nexus' between the employee's use or misuse of [his]

authority as a public employee, and the violation allegedly committed by the defendant." *Jojola,*

55 F.3d at 493 (internal citations omitted); *Martin v. City of Albuquerque*, 147 F. Supp. 3d 1298,

1317 (D.N.M. 2015).  It is "the plaintiff's burden to plead, and ultimately establish, the existence

of 'a real nexus' between the defendant's conduct and the defendant's 'badge' of state authority

in order to demonstrate action was taken 'under color of state law.'" *Jojola*, 55 F.3d at 494.

Because what amounts to a "real nexus" between public employment and the misuse of the

public office is not always clear, courts view the tort in the context of the totality of the

circumstances.  *Id*.

> Not every act of wrongdoing committed by a public employee will constitute "state
> action."  For the state to be held responsible for an employee's actions, such actions
> must flow from his or her job duties or state-conferred authority.  Although no
> single factor will be decisive, courts usually examine such factors as whether the
> employee was on duty, whether his contact with the victim was caused by or
> required by his official job duties, or whether the employee actually used state-
> conferred authority to accomplish the deed....

*Giron v. Corrections Corp. of America*, 14 F. Supp. 2d 1245, 1248 (D.N.M. 1998) (quotation

omitted).  In *Jojola*, the Tenth Circuit distinguished a school custodian's sexual molestation of a

student from requisite state action for purposes of § 1983 because the complaint was devoid of

any allegation that defendant enticed plaintiff into the classroom through the use or misuse of

any state authority he may have possessed.  *Jojola*, 55 F.3d at 494; *but see Giron* 14 F. Supp. 2d

at 1249 n.3 (applying government function doctrine to find that prison guard acted under color of

state law when he used his employment to gain access and rape prisoner).

### III.  <u>ANALYSIS</u>

The parties disagree whether Defendant Gallegos was acting under color of state law

when he reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger.  The

Court will consider this argument first.

### A.    <u>Undisputed Material Facts Related to the Tasing Incident</u>

Plaintiff is a corrections officer at the Rio Arriba County Adult Detention Facility.  Doc.

1-1 at 1, ¶ 1.  Defendant Gallegos is a deputy sheriff with the Rio Arriba County Sheriff's Office

since 2013, and was assigned to court security, civil process and patrol in 2019.  Doc. 21 at 4, ¶¶

1-2.  Plaintiff and Defendant Gallegos knew each other from work for some number of years.[3]

Doc. 21 at 6, ¶ 17, Doc. 31-2 at 3, ¶¶ 22-23.  Prior to May 2019, Defendant Gallegos carried an

XP-26 Taser on his Sam Brown belt.  *Id.* at 4, ¶ 3.  All of the functions of the XP-26 Taser are

activated from the electronic trigger mechanism.  *Id.* at ¶ 4.  To deploy the XP-26 Taser in drive

stun mode, the cartridge containing the darts needs to be removed from the XP-26 Taser.  *Id.* at

¶ 6.  To activate a drive stun, the electronic trigger is pulled.  *Id.*  To display what is referred to

as an "arc" or "spark" warning, the cartridge containing the darts needs to be removed from the

XP-26 Taser.  *Id.* at ¶ 7.  To activate a visible arc or spark warning, which visibly displays an

electrical charge between the two prongs of the XP-26 Taser used for drive stunning, the

electronic trigger is pulled.  Doc. 21 at 4-5, ¶ 7.  In May 2019, Defendant Gallegos received an

---

[3] Defendant states he has known Plaintiff for six years.  Doc. 21 at ¶ 17.  Plaintiff states he and Defendant were work acquaintances for four years.  Doc. 31-2 at 3, ¶¶ 22-23.

X-2 Taser to replace the XP-26 Taser he was carrying.  Doc. 21 at 5, ¶ 8.  Defendant Gallegos was advised that the X-2 Taser operated differently than the XP-26 Taser, but he did not train on the X-2 Taser after it was issued to him.  *Id.*  The X-2 Taser contains two cartridges of darts which do not have to be removed in order to deploy the X-2 Taser in drive stun mode or to deploy an arc waring.  *Id.* at ¶ 9.  Not all of the functions of the X-2 Taser operate off of the electronic trigger mechanism.  *Id.*  To deploy the X-2 Taser in dart mode, the electronic trigger must be pulled, similar in operation to the XP-26 Taser.  *Id*. at ¶ 10.  To deploy the X-2 Taser in drive stun or arc warning mode, a button on either side of the X-2 Taser needs to be depressed. *Id*. at ¶ 11.

On June 3, 2019, Plaintiff was in his work uniform and conducting his official duties as a corrections officer at the Detention Facility.  Doc. 31-2 at 1, ¶¶ 2, 9.  Defendant Gallegos was on duty in full uniform, in a marked patrol unit, and assigned to pick up inmates at the Detention Facility and transport them to court.  Doc. 21 at 5, ¶ 12.  Defendant Gallegos was accompanied by Deputy Isaiah Anaya, who followed in his own marked patrol unit, and also by Transport Officer Ronald Campos, who followed in a transport van.  *Id.* at ¶ 13.  Defendant Gallegos approached the security gate of the exterior perimeter to the Detention Facility and beeped his horn.  *Id.* at ¶ 14, Doc. 31 at ¶ 14.  Plaintiff opened the gate and Defendant Gallegos proceeded into the yard of the Detention Facility.  Doc. 21 at 5, ¶ 15. Doc. 31-2 at 2, ¶ 9.  As Defendant Gallegos was proceeding through the yard, Plaintiff exited the side door of the Detention Facility and went out to meet Defendant Gallegos at the sally port.  Doc. 21 at 6, ¶ 16, Doc. 31-2 at 1, ¶ 4.  Defendant Gallegos drove toward the sally port area and stopped his vehicle as he approached it.  Doc. 21 at 6, ¶ 18.  Deputy Anaya pulled in behind Defendant Gallegos, followed by Transport Officer Campos.  *Id*. at ¶ 19.  Defendant Gallegos exited his patrol unit to secure

his service weapon in the trunk as he was not allowed to enter the Detention Facility armed.  *Id.* at ¶ 20.  As Defendant Gallegos was opening his trunk, Plaintiff said to Defendant Gallegos to "stop beeping his fucking horn at my jail."  *Id.* at ¶ 21, Doc. 31-2 at 1, ¶ 6.  Defendant Gallegos laughed and said to Plaintiff that the jail was not Plaintiff's.  *Id.* at ¶ 22, *Id.* at ¶ 7.  Defendant Gallegos then pulled out his X-2 Taser, pointed it at Plaintiff's groin, and pulled the electronic trigger.  *Id.* at ¶ 23; *Id.*  The X-2 Taser deployed in dart mode and the darts struck Plaintiff in the groin area.  Doc. 21 at 6, ¶ 25.  Plaintiff fell to the ground in pain and pulled the darts from his work trousers.  Doc. 21 at 7, ¶ 27, Doc. 31-2 at ¶ 9.  Defendant Gallegos retrieved the darts, connected the wires, and secured them in the trunk of his patrol unit.  Doc. 21 at 7, ¶ 30.  After some minutes, Plaintiff walked into the Detention Facility under his own power.  *Id.*, Doc. 31-2 at 2, ¶ 16.  The incident was captured on the Detention Facility's video surveillance system. Doc. 21 at 7, ¶ 35.

### B.      Disputed Allegations Related to Tasing Incident

Defendant Gallegos alleges that he believed Plaintiff's comment to him about not "honking his horn at my jail" was made in a joking manner and that he responded to Plaintiff that the jail was not Plaintiff's in a joking manner.  Doc. 21 at 6, ¶¶ 21-22.  Defendant Gallegos alleges that as the two were joking with one another, and that he pulled his X-2 Taser from his Sam Brown belt and pointed it at Plaintiff's groin intending to display an "arc" warning.  *Id.* at ¶ 23.  Defendant Gallegos further alleges that when he pulled the trigger on the X-2 Taser, the mechanism for activating a visible arc or spark warning on the XP-26 Taser, he did so from muscle memory of using the XP-26 Taser and that he was surprised when the X-2 Taser deployed in dart mode.  *Id.* at ¶¶ 24-25.  Defendant Gallegos said he immediately turned the X-2 Taser off, was shocked by what occurred, and asked Plaintiff if he was okay to which Plaintiff

responded he was.  *Id.* at 7, ¶¶ 28, 29.  Defendant Gallegos said he never had any intention to

seize, injure or sexually harass Plaintiff, and that he was engaged in unofficial horseplay with

Plaintiff, who he considered a friend.  *Id.* at ¶ 34.

Plaintiff alleges that he did not consider Defendant Gallegos his friend, that he and

Defendant Gallegos were only work acquaintances, that he was not joking when he told

Defendant Gallegos to "stop beeping his fucking horn at my jail," and that there was no

horseplay involved in their exchange.  Doc. 31 at 5-6, Doc. 31-2 at 1-2, ¶¶ 6, 8, 22, 23.  Plaintiff

also alleges that Defendant Gallegos responded to his "beeping" comment by saying "this is not

your jail it is mine."  Doc. 31-2 at 1, ¶ 7.  Plaintiff alleges that Defendant Gallegos intended to

seize and injure him, and that "Gallegos' sexual battery" on him was related to his official duties.

Doc. 31 at 6.  Plaintiff further alleges that Defendant Gallegos did not ask him if he was okay

and that he did not respond that he was.  *Id.*  Finally, Plaintiff contends that whether Defendant

Gallegos intended to display an "arc" warning, whether Defendant Gallegos's muscle memory

took over when he pulled the electronic trigger mechanism of the X-2 Taser, and whether

Defendant Gallegos was surprised and shocked when the X-2 deployed darts are all questions for

the jury.  Doc. 31 at 5-6.

### C.    Defendants' Argument

Defendants invoke *Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995), as most analogous to

the case at hand.  Doc. 21 at 12.  In that case, a more experienced member of the Puerto Rico

police force, Officer Valentin, began taunting plaintiff Martinez, also a police officer and a

newer member of the police force, soon after Martinez arrived at the precinct one morning to

prepare for his shift.  *Id.* at 982.  Officer Valentin's taunting included, *inter alia*, calling Martinez

names, ripping Martinez's undershirt, drawing his service weapon and pointing it at Martinez's

stomach, cocking the hammer, placing his finger on the trigger, and inquiring whether Martinez was afraid. *Id.* For his part, Martinez attempted to dismiss Officer Valentin and to walk away. *Id.* After Martinez had changed into his uniform and reported to his shift supervisor, Officer Valentin approached Martinez again. *Id.* This time Officer Valentin pointed his revolver at Martinez's genitals, cocked the hammer, and with his finger on the trigger threatened to "blow away" Martinez's penis. *Id.* When Officer Valentin lowered the weapon, Martinez moved away. *Id.* Within minutes, Officer Valentin again approached Martinez, cocked the revolver, aimed it at Martinez's groin, and resumed his taunting. *Id.* The revolver accidentally discharged, maiming Martinez. *Id.* Roughly twenty minutes elapsed from the start of Officer Valentin's taunting of Martinez to when the revolver discharged, all of which occurred before the 4:00 a.m. shift change. *Id.* The parties agreed that the shooting was unintentional. *Id.*

Martinez filed suit in federal district court against three officers alleging that his rights had been abridged in that each defendant owed him a duty to intervene and protect him from readily discernible harm at the hands of Officer Valentin. *Id.* at 983. Notably, Martinez did not file suit against Valentin. Martinez also asserted pendent tort claims against the three defendants, and with respect to one officer asserted a section 1983 claim based on supervisory liability. *Id.*

The *Martinez* court began its "under color of law" analysis by observing that determining whether an officer acted under color of state law "rarely depends on any single, easily determinable fact, such as a policemen's garb" and that misuse of or action in excess of authority is action under color of law. *Id.* at 986. "[C]ourts must beware [of] simplistic solutions . . . . The point is that segregating private action from state action calls for a more sophisticated analysis." *Id.* Rather than relying on a wooden application of factors, the inquiry "turns on the

nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Id.* It is not enough that the officer's position is a but-for enabler of his action.[4] Rather, "the actor, at the time in question" must "purpose[] to act in an official capacity or to exercise official responsibilities pursuant to state law," *id.*, and so the court must examine "additional indicia of state authority to conclude that the officer acted under color of state law" rather than "in pursuit of private activities." *Id.* at 988 (citing *Barna*, 42 F.3d at 816).[5] Without "some meaningful" relationship to the officer's status or duties, his conduct cannot be under "pretense" of law, and therefore cannot be under color of law. *Id.* at 986-87. To assess whether Officer Valentin's action constituted "purely personal pursuit or, conversely,

---

[4] *Martinez* contained the language that "[i]n general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or *unless the conduct is such that the actor could not have behaved in that way but for the authority of his office.*" 54 F.3d at 986 (emphasis added). In *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445 (1st Cir. 1997), the plaintiffs, citing this language from *Martinez*, argued that Officer "Hernandez acted under color of state law because but for his official authority, he could never have done what he did." 108 F.3d at 449. The First Circuit Court of Appeals rejected such an "expansive" reading and noted that it had "rejected such a sweeping standard for § 1983 liability" in *Martinez* itself, in favor of the totality of the circumstances standard discussed above. *Id.*

[5] In *Barna v. City of Perth Amboy*, 42 F.3d 809 (3d Cir. 1994), the Third Circuit upheld the district court's dismissal as a matter of law of plaintiff's § 1983 assault-based claim against the defendant officers "because the evidence could not support a finding that the officers were acting under color of state law." *Id.* at 812. In *Barna*, two off-duty officers, both carrying service revolvers and police-issued nightsticks, followed plaintiffs to their home where a domestic dispute arose and the defendant officers "attacked and beat Mr. Barna" and placed him in a chokehold with a police-issued nightstick. *Id.* at 813. The defendant officers returned to their truck and attempted to leave when Mr. Barna retrieved an unloaded weapon and pointed it them. *Id.* at 814. Once the gun was no longer pointed at them, the officers alighted from the truck and drew on Mr. Barna, who ran into his house and returned with a shotgun and told the officers not to leave before retreating again into his home. *Id.* The officers called for backup, and the on-duty officers who arrived at the scene arrested Mr. Barna. *Id.* The Barnas subsequently sued the two off-duty officers for violation of their civil rights under § 1983. *Id.* The Third Circuit divided the events into discrete episodes for purposes of analysis noting that the fact that a police officer who purports to act with official authority in one moment is not necessarily sufficient for a determination that he did so in the next. *Id.* at 817-18. The Third Circuit noted that the defendant officers were off-duty, and while that alone was not dispositive, "there was no evidence to indicate the police officers were on official police business" when they followed the Barnas home and became embroiled in the domestic dispute. *Id.* The Third Circuit found that the defendant officers did not invoke their police authority by identifying themselves as police or showing their badges. *Id.* Further, there was no evidence that the alleged assault occurred as a result of official police concerns, and the alleged assault had already concluded when Mr. Barna retrieved his weapon and pointed it at the officers as they attempted to leave. *Id.*

whether he was acting under color of state law," required the *Martinez* court to "assess the nature of his conduct in light of the totality of the circumstances."[6]

The *Martinez* court concluded that rather than exercising or purporting to exercise any "real or pretended" power under state law, Officer "Valentin was bent on a singularly personal frolic: tormenting an acquaintance." *Id.* at 987. "Hazing of this sort, though reprehensible" the First Circuit concluded, "is not action under color or pretense of law." *Id.* True, Officer Martinez was on duty and in uniform, the events transpired at the police station, and Officer Valentin shot Martinez with his service revolver. But viewed, as they must be, in context, these facts still do not indicate that "Valentin's actions were in any meaningful way related either to his official status or to the performance of his police duties." *Id.* (analogizing to *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. 1981) (*per curiam*) (holding that a police chief's assault on a private citizen was not conduct under color of law even though it occurred at police headquarters)). Without "additional indicia of state authority," *id.* at 988 (quoting *Barna*, 42 F.3d at 817-18), the First Circuit considered "the unauthorized use of a government-issue weapon . . . was too attenuated a link to hold together a section 1983 claim." *Id.* (citing *Barna*, 42 F.3d at 817-18 (holding that "unauthorized use of a police-issue nightstick is simply not enough to color [a] clearly personal family dispute with the imprimatur of state authority")).

Defendants also cite to a number of other cases in which courts have concluded that "horseplay" or hazing by government employees while on duty was found not to be state action

---

[6] The Tenth Circuit has cited *Martinez v. Colon* in several of its cases when articulating this circuit's legal standard for determining whether a state actor was acting under the color of state law. *See U.S. v. Cintron*, 482 F. App'x 353, 357 (10th Cir. 2012) (unpublished); *Hicks v. Woodruff*, 216 F.3d 1087, at *4 (10th Cir. 2000) (unpublished); *Carlsen v. Duron*, 134 F.3d 382, at *3 (Table) (10th Cir. 1998) (unpublished); *Strange v. Porath*, 104 F.3d 368, at *2-3 (10th Cir. 1996) (unpublished); *David v. City and County of Denver*, 101 F.3d 1344, 1353-54 (10th Cir. 1996) (stating that the Court must examine the nature and circumstances of the conduct to the performance of official duties).

under color of law.  Doc. 21 at 13, fn. 1.  In *Haines v. Fisher*, 82 F.3d 1503 (10th Cir. 1996),

three police officers and one police dispatcher determined to play a practical joke on plaintiff,

who was a local 7-Eleven clerk and was working the night shift alone when the incident

occurred.  *Id.* at 1505.  The plan involved the officers staging a hold up at the 7-Eleven.  *Id.*  The

officer disguising himself as the robber wore part of his police uniform (pants and shoes) that he

covered with a trench coat that belonged to the town, wore a mask that belonged to the town, and

carried the town's M-16 automatic rifle loaded with blanks.  *Id.*  The disguised officer entered

the 7-Eleven intending to "shoot off" the M-16, but the safety, at least initially, prevented the

gun from firing.  *Id.*  The disguised officer ordered plaintiff onto the ground.  *Id.*  Plaintiff claims

that the disguised officer pointed the gun at him and discharged the weapon when he was told to

get on the ground.  *Id.*  The defendants agree that the gun was discharged at some point but that

the blanks were fired away from plaintiff.  *Id.*  Pretty quickly into the staged robbery, plaintiff

recognized the disguised officer and according to defendants they all had a good laugh.  *Id.*

Soon thereafter, however, plaintiff filed suit against the officers and others alleging several

constitutional violations.

The district court in *Haines* granted summary judgment in favor of the officers and

plaintiff appealed.  82 F.3d at 1507.  On appeal, the question, according to plaintiff, was whether

the retaliation of the officers in response to his earlier call was a "personal pursuit" or an

"overstep' in the exercise of legitimate authority.[7]  *Id.* at 1508.  The Tenth Circuit held that the

district court did not err in granting summary judgment in favor of the individual defendants on

plaintiff's § 1983 claims.  *Id.*  The court explained that "[t]his is not a case in which the

---

[7] Prior to the incident, plaintiff had called the police department with reports of suspicious vehicles.  82 F.3d at
1505, n. 1.  Plaintiff argued that the staged robbery was in retaliation for his earlier call.  *Id.*

defendants "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer [was] clothed with the authority of the state law.'"  *Id.*  The court agreed with the district court that "[i]n this case, the defendants . . . were not using their badges of authority, *i.e.,* their positions as [] policemen . . to accomplish the 7-Eleven prank[.]"  *Id.*  Finally, the court reasoned that if, as plaintiff had alleged in his complaint, the purpose behind the police officers' conduct was to scare him so that he would be "intimidated by them and lured into their lurid alternative life style," that the acts of the individual officers would clearly fall within "the gambit of their personal pursuits" and could not be considered acts under color of state law.  *Id.*

In *Harris v. Rhodes*, 94 F.3d 196, 197 (5th Cir. 1996), plaintiff, an inmate at the jail, brought a § 1983 civil rights action against a prison maintenance worker, Rhodes.  The two men were joking together when a comment by plaintiff angered Rhodes and resulted in Rhodes punching plaintiff in the nose.  *Id.* at 197. The district court granted summary judgment in favor of Rhodes.  *Id.*  On appeal, the Fifth Circuit affirmed and explained that the material facts in the case demonstrated that the altercation involved a purely private aim and no misuse of state authority.  *Id.*  The court further explained that the summary judgment evidence and plaintiff's own statements demonstrated that the incident was horseplay and that when the dispute arose, Rhodes resolved the personal dispute through personal means – punching plaintiff in the nose.  *Id.*  The court further noted that "[r]egardless of whether the punch was accidental or intentional," the prison worker was not acting under color of state law when engaging in this purely personal dispute.  *Id.* at 198, n. 1.

In *Molera v. City of Nogales*, No. CV-11-00097-TUC-JGZ, 2013 WL 4804292 (D. Ariz. Sept. 9, 2013), plaintiff, an officer of the Nogales Police Department, filed suit against his sergeant alleging constitutional violations following a tasing incident while at work.  It was

undisputed that the two engaged in frequent horseplay, which included taunting and physically challenging each other. *Id.* at *1.  The incident in question involved a confrontation between the parties in which the sergeant unholstered his department-issued Taser and removed the cartridge. *Id.*  Believing he was joking, plaintiff moved toward the sergeant and said something along the lines of "if you are going to take it out, use it." *Id.*  Despite feeling the Taser on his penis, plaintiff did not step back. *Id.*  The sergeant turned the Taser on and off, shocking plaintiff on his penis. *Id.*  The sergeant testified he did not intend to cause plaintiff harm and that he was unaware of how close plaintiff was to the Taser when he turned it on. *Id.*  The United States District Court of Arizona held that the sergeant was entitled to summary judgment on plaintiff's § 1983 claims because the sergeant was not acting under color of state law when he tased plaintiff. *Id.* at *5.  The court determined that no reasonable juror could infer that the sergeant was pretending to act in his official capacity when he tased plaintiff, that the facts demonstrated the two had historically threatened to tase each other, and that at the time of the tasing plaintiff was posturing and/or standing over the sergeant daring him to turn the Taser on. *Id.*  The court also determined that tasing a subordinate officer was undisputedly outside the scope of the sergeant's official duties. *Id.*  Finally, the court found that the facts of this case were similar to *Martinez v. Colon*, in which one officer accidentally shot another officer in the groin while "horsing around," and wherein the court concluded that "though on duty and in uniform, [the assailant's] status as a police officer simply did not enter into his benighted harassment of his fellow officer.  Hazing of this sort, though reprehensible, is not action under color or pretense of law." *Id.* (quoting *Martinez*, 54 F.3d at 987).

Finally, Defendants cite *Washington-Pope v. City of Philadelphia*, 979 F. Supp. 2d 544 (E.D. Pa. 2013), where the district court found that an on-duty police officer was not acting

under color of state law when he pointed his service weapon at his partner's temple during an argument in their patrol vehicle over whether the officer had taken his diabetes medication. *Id.* at 588. In *Washington-Pope*, plaintiff and Officer Bailey ("Bailey") were on the graveyard shift responding to various calls. *Id.* at 547. Soon after the shift began, plaintiff believed that Bailey was behaving oddly, *i.e.,* hearing noises from the car, driving in the wrong direction to a call, slowing down and speeding up, and suspecting they were being followed. *Id.* Plaintiff, having a hazy memory that Bailey had behaved oddly before, asked Bailey if he had taken his medication. *Id.* This inquiry sparked a verbal exchange between them and culminated in Bailey drawing his service weapon and pointing it at plaintiff. *Id.* Plaintiff recalled that it was not unusual for Officer Bailey to take things too far or handle matters with a "violent undertone." *Id.* at 547-48. Thinking she might escape from the car plaintiff tried the door but could not release the lock. *Id.* at 548. She then resorted to challenging Officer Bailey on whether he actually intended to shoot her. *Id.* Bailey eventually holstered the gun and they proceeded to their next call. *Id.* Plaintiff sued Bailey, and the City of Philadelphia, alleging Bailey had violated her rights to liberty, bodily integrity, and freedom from unreasonable search and seizure. *Id.*

The district court ultimately determined that Bailey was not acting under color of state law when he pointed the gun at plaintiff. *Id.* at 568-73. Bailey argued that when he pointed the gun at plaintiff, it was precipitated by a verbal exchange completely unrelated to the performance of his duties as a police officer. *Id.* at 568. Bailey further argued that there was no evidence that any of his actions that were directed at his partner were taken for the purpose of exercising his authority as a police officer. *Id.* Plaintiff disagreed and contended that Bailey's actions were not unconnected to the execution of his official duties because he was acting pursuant to his official duties on the night of the incident when she was forced to partner-up and share a patrol car with

him, and where they were on-duty and exercised their police powers in responding to calls over

an entire shift. *Id.* at 570-71. Plaintiff contended that Bailey did not suddenly lose the cloak of

government action when he pointed his gun at plaintiff. *Id.* at 570-71.

The court, having canvassed various circuit and district court case law, was unpersuaded.

The court explained that plaintiff's suggestion that but for being forced to "partner-up with"

Bailey the incident would not have occurred was unavailing because the case law established that

it is an officer's purporting to exercise authority – some vestige, but not necessarily the whole

cloth of which he possesses -- that brings his conduct under color of law, not the unfortunate

coincidence of their co-employment. *Id.* at 569. In other words, the court explained that Bailey

must have purported to act under authority of law at the moment when he pointed the gun at

plaintiff's head. *Id.* The court concluded that nothing suggested that Bailey pretended to act

with any official police authority when he raised his service weapon. *Id.* at 569. The court

further explained that the question was not what Bailey was doing five minutes or even ten

seconds before the violent act, but the nature of the act he committed toward his partner at the

moment in time he committed it. *Id.* The court also explained that in cases of violence between

two officers, without more, the fact that the perpetrator was on duty and that he committed the

violence complained of with a police-issue gun and on police property – here, in a patrol car –

was insufficient to bring his conduct under color of law. *Id.* While these manifestations of

police authority were not per se determinants, they were indicators to help answer the question of

whether the officer acted under pretense of law, such that the victim officer could have believed

that he was acting with the imprimatur of the state – viz., whether the victim was intimidated by

the perpetrating officer's official status. *Id.* at 570. Lastly, the court reasoned that even if the

court were to draw the inference that plaintiff's "criticisms" communicated to Bailey were job-

related, the § 1983 inquiry focuses not so much on *why* the perpetrator acted, but *how*. *Id.* at 571

(emphasis in original).  Although the why is relevant to informing the how, the ultimate question

remained whether the officer acted, or purported to act, pursuant to his authority such that his

conduct was not only his, but also, in fairness, the State's.  *Id.*  The court concluded that though

Bailey's conduct was unquestionably wrongful, it was not under color of law.  *Id.* at 572-73.

Relying primarily on *Martinez*, Defendants argue here that assessing Defendant

Gallegos's conduct in light of the totality of the circumstances, that Defendant Gallegos's use of

the X-2 Taser was not in furtherance of his assigned duties as a deputy, but rather as an attempt

to joke with Plaintiff.  Doc. 21 at 13.  Defendants further argue that Defendant Gallegos did not

show his badge, did not use his status as a deputy in furtherance of his horseplay, and that he was

not engaged in an assigned duty when he reached for his X-2 Taser, pointed it at Plaintiff's

groin, and pulled the trigger.  Doc. 21 at 13.  As such, Defendants argue that Defendant Gallegos

was not acting under color of law.

### D.   <u>Plaintiff's Argument</u>

Plaintiff invokes *Cassady v. Tackett*, 938 F.2d 693 (6th Cir. 1991), as most analogous to

this case.  In *Cassady*, Officer Tackett was an elected county jailer with the Johnson County

authorities.  *Id*. at 694.  When a regional jail was constructed, a dispute arose over whether the

facility would be operated by the Regional Jail Authority or Johnson County authorities.  *Id*. at

694.  Litigation followed and the Regional Jail Authority initially prevailed.  *Id.*  Officer Tackett,

however, appealed.  *Id*.  While the appeal was pending, the Regional Jail Authority agreed to

employ Officer Tackett to supervise the incarceration and handling of prisoners, and at the same

time appointed Cassady as the Executive Director of the jail.  *Id.*  Officer Tackett reacted

negatively to Cassady's hiring and over the course of several months continually contested her

authority, ignored her, and proclaimed that she had no business at the facility.  *Id.*  On one

occasion Officer Tackett shouted at Cassady that she was restricted to a certain area of the jail

and dared her to venture further.  *Id.*  Officer Tackett emphasized his shouted order by drawing

back his coat to reveal a holstered gun.  *Id.*  Officer Tackett's fury continued to fester and

eventually led him to storm into Cassady's office, shouting and cursing at her over the latest

clash in their running conflict.  *Id.*  In doing so, Officer Tackett was accompanied by several of

his deputies, including Officer Tackett's son, who, like Officer Tackett, was allegedly armed.  *Id*.

Cassady alleged that Officer Tackett's son and then others threatened to kill her and her husband,

who was present at the time.  *Id.* at 695.  Fearing for their safety, Cassady and her husband

locked themselves in an inner office, where they remained for forty-five minutes until the county

sheriff summoned by Cassady escorted them from the building.  *Id*.

Cassady brought claims against Officer Tackett for deprivation of her substantive due

process rights under the Fourteenth Amendment.  938 F.2d at 694.  The district court granted

Officer Tackett's motion for summary judgment on Cassady's Section 1983 claim, finding that

Officer Tackett's alleged behavior had not violated any of Cassady's constitutional rights.  *Id.*

On appeal, the Sixth Circuit explained that even though the district court had determined that

Officer Tackett's conduct consisted only of threats and there was no infliction of any physical

wrong, that if Cassady reasonably believed that her freedom of movement was restrained and

that she was compelled to remain within her office lest Tackett or his deputies make good their

threats to kill her, she may be able to establish a seizure within the meaning of the Fourth

Amendment.  *Id.* at 696-97.  The court held, in reference to the Fourth Amendment's prohibition

against unreasonable seizures, that Tackett's alleged actions had to be examined under the

totality of the circumstances to determine whether they were objectively reasonable.  *Id.* at 697.

The court further held that where the credibility of the threats presents a jury question as to whether the threats foreseeably resulted in the seizure of the person, a constitutional violation can occur. *Id.* The court, therefore, reversed and remanded to the district court on this issue. *Id.* at 698.

The issue of whether Officer Tackett was acting under color of state law was not on appeal. Nonetheless, as part of the Sixth Circuit's analysis, the court determined that Officer Tackett was acting under color of state law. *Id.* at 695. The court explained that

> [o]ur Circuit has held that an off-duty police officer's use of his gun could be action under the color of state law because he had authority under state law to carry the gun only by virtue of being a police officer, and because the dispute in which he used the gun originated in the performance of his official duties. *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980). . . . Here, we are obliged to conclude that in allegedly flourishing and threatening to use his gun against Cassidy, Tackett acted under color of state law. As in *Layne*, Tackett had authority or power to carry the gun in the jail only because he was the elected jailer of Johnson County.

*Id.*

Plaintiff also cites a number of other circuit court cases in which state officials who engaged in abusive behavior not part of their official duties were nonetheless found to have been acting under color of state law. For example, Plaintiff cites *Lee ex rel. Lee v. Borders*, 764 F.3d 966 (8th Cir. 2014), a case in which a state-employed kitchen worker in a state-run home for developmentally disabled persons took a female resident to a restricted part of the kitchen and raped her. *Id.* In *Lee,* plaintiff sued the kitchen worker in district court for battery and, pursuant to 42 U.S.C. § 1983, for deprivation of her substantive due process right to bodily integrity. *Id.* at 969. After a three-day trial, the jury returned a verdict against the kitchen worker on both counts and awarded Lee $1 million in compensatory damages and $3 million in punitive damages. *Id.* The kitchen worker then moved for judgment as a matter of law or, in the

alternative, a new trial. *Id.*  The district court denied his motion and he appealed to the Eighth

Circuit.  *Id.*  On appeal, the kitchen worker largely reargued his version of the facts he presented

at trial, *i.e.,* that he was not engaged in work-related duties, that the resident was not seeking

food at the time she came to the kitchen, and that the sex was consensual.  *Id.* at 971.  The Eighth

Circuit affirmed the district court explaining that there was evidence in the record that the

kitchen worker had offered food to plaintiff, had dragged her to the restricted area of the kitchen,

that the kitchen workers' employment gave him access both to the kitchen and to plaintiff, and

that the kitchen worker was in charge of the kitchen at the time, so he controlled who entered it

and remained there.  *Id.*  Thus, there being sufficient evidence to reject the kitchen worker's

version of the facts, the Eighth Circuit was not prepared to find judgment as a matter of law

given that  "[r]easonable persons could differ as to the conclusion to be drawn from the

evidence."  *Id.* (citing *EEOC v. Kohler Co.,* 335 F.3d 766, 772 (8th Cir.2003)).

Plaintiff also cited *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), a case in

which the city manager raped a city employee in her apartment.  On appeal of the district court's

judgment on jury verdict, the city maintained that as a matter of law it could not be liable for any

sexual assault committed by the city manager because the city manager was not acting under

color of state law at the time of the assault.  *Id.* at 1303.  Based on the totality of facts and

circumstances of this case and construing all of the evidence in a light most favorable to plaintiff,

the Eleventh Circuit determined there was evidence from which a reasonable jury could conclude

that the city manager's actions in harassing and ultimately raping plaintiff Griffin occurred while

he was acting under color of law.  *Id.*  For example, the evidence demonstrated that the events

leading up to the rape began at a function where the city manager attended as the city manager.

*Id.* at 1304.  The city manager invoked his authority to create the opportunity to be alone with

plaintiff and to take her home. *Id.* The city manager used his authority to permit plaintiff to park her car inside the city's police department and told her that he would have the city fix it. *Id.* During the ride from the police station to her apartment, the city manager and plaintiff discussed plaintiff's work for the city, and the city manager tried to dissuade plaintiff from leaving her job. *Id.* Upon their arrival at plaintiff's apartment and after insisting on helping her with her equipment, the city manager made sexual advances and when rebuffed reminded plaintiff of his authority by saying "I can't believe you are telling me no after everything that I have done for you." *Id.* After the rape, the city manager used his authority to have a city employee repair plaintiff's car and instructed that city employee not to ask any questions or to answer any questions about the car repair. *Id.* at 1304-05. The Eleventh Circuit also cited evidence of the city manager's abuse of authority leading up to the rape. *Id.* at 1305. For example, the court noted that the city manager's abuse of his authority began the first day of his employment when he begin harassing and intimidating plaintiff by repeatedly insisting she owed him something for "all of the things" that he did for her, including giving her a pay raise for which she was apparently not entitled, threatening her with her job if she did not do certain things for him like cook, lose weight, and tell him how good he looked, demanding that she work in his office (although he apparently gave her no work), touching her inappropriately, continually requesting hugs, dates, and favors despite her refusal to go out with him, and asking her intimate questions. *Id.* The Eleventh Circuit concluded that it was within the context of the city manager's continual exploitation of and leverage of his authority over plaintiff that a sufficient nexus was found between his duties and obligations as city manager and plaintiff's boss and the abuse of that authority to facilitate his harassment and ultimate sexual assault of plaintiff. *Id.*

Plaintiff cited *Whitney v. State of N.M.,* 113 F.3d 1170 (10th Cir. 1997), in which the Tenth Circuit reversed the district court's dismissal of plaintiff *pro se's* § 1983 harassment and defamation claims against a state employee.  In *Whitney*, plaintiff *pro se* alleged that a state employee had violated her right to equal protection by discriminating against her and harassing her on the basis of her sex.  *Id*. at 1172.  The Tenth Circuit acknowledged that the complaint was far from clear, but that reading it in a light most favorable to plaintiff *pro se*, she appeared to allege that New Mexico, through its state employee, who had state-derived authority over her ability to get a day care license, harassed her and denied her a license to operate a day care facility because she was female.  *Id.* at 1174-75.  The Tenth Circuit further noted that the state employee could not have harassed plaintiff *pro se* absent his authority as an agent for the State.  *Id.* at 1175.  The Tenth Circuit, therefore, concluded that plaintiff *pro se's* allegations of sexual harassment by the state employee were sufficient to state a claim for relief under § 1983.  *Id.*

Finally, Plaintiff cites *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991), a case in which the Fifth Circuit affirmed that a deputy sheriff acted under color of state law when he battered a man named Vestal who had had an affair with Tarpley's wife.  In *Tarpley*, the deputy sheriff devised a plan to lure Vestal to the deputy sheriff's home for the purpose of assaulting him.  *Id.* at 807.  The deputy sheriff, and another sheriff, Pena, made a pair of "sap gloves"[8] at his office to use on Vestal.  *Id*. at 808.  On the evening of the battery, the deputy sheriff parked his patrol car behind the house of another deputy so as not to alert Vestal that he was home.  *Id.* When Vestal arrived, the deputy sheriff's wife opened the door and pulled Vestal into the house. *Id.*  The deputy sheriff immediately tackled Vestal and hit him repeatedly in the head.  *Id.*  The deputy sheriff also inserted his service pistol in Vestal's mouth.  *Id.*  The deputy sheriff told

---

[8] These are gloves with rubber hosing filled with metal or lead shot attached to the fingers.  945 F.2d at 807.

Vestal that he was a sergeant on the police department, that he would and should kill Vestal, and that he could get away with it because he was a cop. *Id.* The deputy sheriff repeated "I'll kill you. I'm a cop. I can." *Id.* As he continued to beat and threaten Vestal, the deputy sheriff's wife telephoned the sheriff's station and asked Pena to come to their house. *Id.* When Pena arrived, the deputy sheriff introduced him to Vestal as a fellow sergeant from the police department. *Id.* Pena confirmed the deputy sheriff's claims that the deputy sheriff had shot people in the past. *Id.* Eventually, the deputy sheriff let Vestal go, chasing him out of the house with threats to kill him if he reported the incident. *Id.* Pena and the undersheriff followed Vestal in Pena's squad car until Vestal had left town *Id.* Pena also apparently radioed for another officer to meet up with them and that police car also followed Vestal to the edge of town. *Id.* The Fifth Circuit determined there was sufficient evidence in the record from which a rational juror could conclude that the deputy sheriff Tarpley was acting under color of law because the deputy sheriff did more than simply use his service weapon and identify himself as a police officer. *Id.* 809. The court noted that at several points during his assault of Vestal, the deputy sheriff claimed to have special authority for his actions by virtue of his official status. *Id.* He claimed that he could kill Vestal because he was an officer of the law. *Id.* Significantly, the deputy sheriff summoned another police officer from the sheriff's station and identified him to Vestal as a fellow officer and ally. *Id.* The men then proceeded to run Vestal out of town in Pena's squad car. *Id.* The presence of police and the air of official authority pervaded the entire incident. *Id.* Under these circumstances, the Fifth Circuit determined there was sufficient evidence for a rational juror to conclude that the deputy sheriff acted under color of law. *Id.*

Relying primarily on *Cassady*, Plaintiff argues that Defendant Gallegos was acting under color of state law because Plaintiff would not have let a private citizen into the jail to pick up a

detainee and because Defendant Gallegos was carrying a Taser to fulfill his public responsibilities.  Doc. 31 at 11.  Plaintiff further argues that while Defendants call this vicious battery "horseplay," Plaintiff perceived the receipt of the X-2 Taser dart prongs in his genitals as an angry reaction to his challenge of how Defendant Gallegos performed his duties.  *Id.*  In addition, Plaintiff asserts that Defendant Gallegos had authority over him because Plaintiff had to open the gate of the jail to Defendant Gallegos and had Plaintiff refused to do so he could have been disciplined for failure to do his job.  *Id.* at 12.  As such, Plaintiff asserts that the Sheriff's Department allowed Defendant Gallegos to have access and control of Plaintiff.  *Id.*

### E.      Defendant Gallegos Was Not Acting Under Color of State Law When He Tased Plaintiff

#### 1.      Relevant Case Law

The Court finds Plaintiff's reliance on *Cassady* is misplaced.  As an initial matter, whether the defendant officers in *Cassady* acted under color of state law was not an issue on appeal before the Sixth Circuit.[9]  Nonetheless, as part of its two-part under color of law inquiry, the Sixth Circuit concluded that Tackett was acting under color of state law explaining only that the court was *obliged* to conclude that in allegedly flourishing and threatening to use his gun against Cassady, Tackett had acted under color of state law because he had the authority or power to carry a gun in the jail *only because he was the elected jailer of Johnson County*. *Cassady*, 938 F.2d at 695 (emphasis added).[10]  The Sixth Circuit's limited under color of law

---

[9] In finding that the district court had improperly granted summary judgment in favor of defendants, the Sixth Circuit focused on the Fourth Amendment's prohibitions against unreasonable seizures.  938 F.2d at 696-97.  The Sixth Circuit explained that if Cassady reasonably believed that her freedom of movement was restrained and that she was compelled to remain within her office lest Tackett or his deputies make good their threats to kill her, she may be able to establish a seizure within the meaning of the Fourth Amendment.  *Id.* at 696-97.  The court further held that where the credibility of the threats presents a jury question as to whether the threats foreseeably resulted in the seizure of the person, a constitutional violation can occur.  *Id.*

[10] The Sixth Circuit cited *Layne v. Sampley,* 627 F.2d 12 (6th Cir.1980), in which the Sixth Circuit found that an officer who was off duty but in possession of his service revolver, "which was his own property and which he was

analysis in *Cassady*, therefore, is not helpful to the Court's analysis here.[11]  Moreover, the facts in *Cassady* are distinguishable.  The final threatening incident giving rise to Cassady's claims was preceded by months of conflict with Officer Tackett, including harassment, threats and brandishing of weapons.  938 F.2d at 695.  Here, Plaintiff has presented no evidence of any history with or even a single incident of conflict, harassment or personal dispute between himself and Defendant Gallegos either in the four years they worked together prior to the incident or since the incident occurred.  Nor has Plaintiff presented any evidence that Defendant Gallegos engaged in any harassing or violent behavior with anyone else in the workplace, or elsewhere, in the disposition of his duties as a deputy sheriff either prior to or since the incident occurred.  To the contrary, based on the undisputed material facts, the incident here is isolated and took place in a matter of seconds.

---

authorized but not required to carry when off-duty," acted under color of state law. *Id.* at 12.  In that case, the officer had been called to Layne's house to investigate a complaint of a domestic disturbance. Layne later threatened the officer, and when Layne spotted the officer in civilian clothing, he approached him and began an argument. The argument during which the officer shot Layne, then, had its genesis in the officer's performance of his police duties. *Id.* at 13. Further, the Court based its decision on (1) the fact that the officer had authority to carry the gun *only* because he was a police officer (permission to carry a handgun in Tennessee extended only to law enforcement officers), and (2) the fact that Layne had threatened the officer by phoning the police headquarters and thus the threat was received through a police agency. *Id.*

[11] The Sixth Circuit has applied a totality of the circumstances standard in other cases involving a color of law analysis.  *See, e.g., Morris v. City of Detroit*, 789 F. App'x 516, 518-19 (6th Cir. 2019) (stating that courts must consider the totality of the circumstances in determining whether an officer was acting under color of law at the time of the alleged constitutional violation and finding that an on-duty officer who used her state-issued gun while collecting a personal debt was not acting under color of law because she did not purport to be conducting police-related business, nor did she attempt to use her status as police officer advantageously); *McNeese v. Vandercook*, 173 F.3d 429, 1999 WL 133266, *2 (6th Cir. 1999) (unpublished table decision) (holding that a deputy sheriff who struck a fellow deputy did not act under color of state law where he did not use his official identification to intimidate plaintiff, did not use any officially-issued equipment to hurt plaintiff, and did not purport to act within the ambit of his official duties); *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (explaining that "[i]t is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law" and finding that off-duty police officer was acting in private capacity, and not under color of state law, at time officer's friends allegedly assaulted patron of restaurant and he helped them flee the scene).

Further, with the exception of *Tarpley*, the additional cases Plaintiff cites and relies upon have in common state actors who both *had* and *abused* their authority over their accusers, which, as more fully explained below, is not the case here.  For example, in *Lee,* the Eighth Circuit explained that there was evidence in the record that the kitchen worker, a state employee, exercised his authority over plaintiff, a resident of the state-run home, by offering her food and dragging her to the restricted area of the kitchen where he could rape her.  *Lee*, 764 F.3d at 969. The court also explained that the kitchen worker's employment gave him access both to the kitchen and to plaintiff, and that the kitchen worker was in charge of the kitchen at the time, so he controlled who entered it and remained there.  *Id.*  Similarly in *Griffin*, the Eleventh Circuit concluded that it was within the context of the city manager's continual exploitation of and leverage of his authority over plaintiff that a sufficient nexus was found between his duties and obligations as city manager and plaintiff's boss and the abuse of that authority to facilitate his harassment and ultimate sexual assault of plaintiff.  *Griffin*, 261 F.3d at 1305.  In *Whitney,* the Tenth Circuit reversed the district court's dismissal of plaintiff *pro se's* § 1983 harassment and defamation claims against a state employee holding that the state employee, who harassed and denied plaintiff a license to operate a day care facility because she was female, could only have done so by exercising his authority as an agent for the State over plaintiff.  *Whitney*, 113 F.3d at 1175.  As such, plaintiff *pro se's* allegations were sufficient to state a claim.  *Id.*

The Court finds Defendants' cited cases are more helpful to its analysis to the extent the facts in those cases involved co-working state actors, as is the case here, and where the respective courts applied the legal standard similar to that applied in the Tenth Circuit, *i.e., Martinez, Molera,* and *Washington-Pope*.  In addition, the Court finds persuasive a recent case from the United States District Court of New York, not cited by the parties.  In *Gomez v. City of*

*New York*, 15-CV-7524 (JPO), 2017 WL 3736693 (S.D.N.Y. Aug. 29, 2017), plaintiff alleged he was assaulted by a fellow officer who, along with two other police officer defendants, violated his constitutional rights to be free from unreasonable and unnecessary use of excessive force and unreasonable seizures, and to bodily integrity. *Id.* at *1, *3.  The incident prompting the suit occurred when four officers responded to a call involving an emotionally disturbed person. *Id.* A scuffle ensued with the emotionally disturbed person during which plaintiff discharged his "OC Spray"[12] in close proximity of his fellow officers. *Id.*  After the situation was in hand and later that same night, one of the fellow officers arranged to meet with plaintiff. *Id.*  In doing so, the fellow officer stated to plaintiff, "Listen, let me tell you something.  Do you think it's funny to spray other officers?" *Id.*  The fellow officer then took out his OC Spray and discharged it into plaintiff's face and eye, saying "Now you know how it feels." *Id.*  The officer further pinned the door shut as plaintiff struggled to exit his car, causing injury to plaintiff's knee. *Id.*

The court explained that its task was to determine where the police officer's official actions ended and his personal conduct began. *Id*. at *4.  At the motion to dismiss stage, the question was whether plaintiff had alleged facts that, if true, would establish that the officer was acting "under color of law" when he intentionally discharged his OC Spray at plaintiff. *Id.* Plaintiff argued that the officer was on duty and in uniform at the time of the assault, that the officer used his police radio and vehicle to arrange the meeting, and used his department-issued OC spray to conduct the attack, and that the officer relied on his status as a police officer and his need to retrieve his department-issued handcuffs as an excuse to gain access to plaintiff. *Id*.  The court explained that while "these indicia of authority could certainly compel the conclusion that [the officer] was acting under color of state law," this case differed in one crucial respect from

---

[12] Pepper spray.

the typical case in that plaintiff was also a police officer.  *Id.*  The court explained that the

traditional color-of-law factors, such as "whether defendants identified themselves as police

officers," "if plaintiff was aware that the defendants were police officers," or "if defendants drew

a firearm or arrested the plaintiff," serve as proxies to measure whether a defendant purported to

exercise his authority over the plaintiff.  *Id.*  "[P]olice officers exercise actual and apparent

authority over civilians that they do not exercise over their co-workers, and an officer is less

likely to act under 'pretense of law,' vis-à-vis his fellow officers."  *Id.* (quoting *Pitchell v.

Callan*, 13 F.3d 545, 548 (2d Cir. 1994) (finding off-duty police officer who, while drunk in his

own home, used his own personal weapon to shoot a guest, did not act under color of state law,

as required to support federal civil rights claim; when officer pointed his gun at guest, he was not

acting in accordance with police regulation, and was not invoking authority of police

department)).

     The court ultimately concluded that the officer was not acting under color of state law

when he used his OC Spray on plaintiff.  *Id.*  The court reasoned that the officer's alleged assault

on plaintiff was a highly "personal pursuit" based on the officer's desire to retaliate against

plaintiff for a perceived slight.  *Id.*  The court reasoned that the allegations did not show that the

officer fundamentally invoked his power as an NYPD officer and that he did not purport to

exercise any power (real or pretended) possessed by virtue of state law, but rather was bent on a

singularly personal frolic: tormenting plaintiff.  *Id.*  Further, there was no indication that plaintiff

was intimidated by the officer's official status – as opposed to by his weapon.  *Id*.  The court,

therefore, concluded that the officer's assault was not accompanied by the "indicia of state

action" necessary to establish conduct under color of law, and that "[h]azing of this sort, though

reprehensible, is not action under color or pretense of law." *Id.* (quoting *Martinez*, 54 F.3d at 987).

### 2.      <u>Totality of the Circumstances in a Fact-Intensive Analysis</u>

While the Court recognizes here that Plaintiff and Defendant Gallegos are not fellow deputy sheriffs, this case undisputedly involves an incident that occurred between two state actors conducting their official duties in the workplace as co-workers.  As such, case law involving altercations between state actor colleagues is particularly instructive.  The inquiry, like any other, must consider the totality of the circumstances in a fact-intensive analysis.  The ultimate question is whether the evidence presents a genuine issue as to whether Defendant Gallegos's conduct at the time he reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger was "related in some meaningful way either to the officer's governmental status or to the performance of his duties," *Martinez*, 54 F.3d at 987, or whether his conduct consisted of "purely private acts which are not furthered by any actual or purported state authority," *Barna*, 42 F.3d at 816.  But the words "related to" alone may not be construed too broadly, and they certainly cannot be construed as simplistic but-for enablement of the perpetrator's conduct only in the sense that if the perpetrator and defendant had not worked together they never would have encountered one another.  Rather, the key determinant is whether the actor, at the time in question, "purposed to act in an official capacity or to exercise official responsibilities pursuant to state law," *Martinez*, 54 F.3d at 986, such that his actions were under the pretense of law – *i.e.,* he had the purpose and effect of influencing the behavior of others, *Anderson v. Warner*, 451 F.3d 1063, 1068-69 (9th Cir. 2006).  *Washington-Pope*, 979 F.2d Supp. at 568.  Where the victim is a fellow officer, a number of indicia of state action lack their usual luminosity.  *Id*. (citing *Barna*, 42 F.3d at 817-18).  Duty status and official attire, not per se

determinative in any case, are less telling; both defendant and plaintiff are likely to be wearing them and understand whatever significance they may or may not have.  Similarly, the question is not whether the perpetrator used official equipment, but how he used it.  *Id.*  If the altercation seems to be "of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights.  *Id.* (citing *Martinez*, 54 F.3d at 988, n. 6).  Thus, behavior by the victim that suggests he was not intimidated by the perpetrator's official status – as opposed by his weapon – militates against finding that the perpetrator acted under color of law.  *Id.* (citations omitted).

Moreover, the court must consider the conduct in the context of the particular moment in which it occurred.  *Id.* at 569 (explaining that the question is the nature of the act defendant officer committed *towards his partner, at the moment in time he committed it*) (emphasis in original) (citing *Barna*, 42 F.3d at 817-18); *see also Martinez*, 54 F.3d at 987 (segregating private action from action attributable to the state requires determining whether officer, at the time and place, was engaged in purely personal pursuits or, conversely whether he was acting under color of state law); *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445 (1st Cir. 1997) (final interchange between plaintiff and defendant officer dominated characterization of the events).  If the officer's actions are consistent with those usually taken by a police officer, they are more likely to be under color of law and vice versa.  And if the perpetrator has supervisory authority over the victimized officer, and purports to abuse that "authority or position," then he likely "wields sufficient authority to satisfy the color of law requirement of 42 U.S.C. § 1983."  *Washington-Pope*, 979 F. Supp. 2d at 568 (citation omitted).  In the absence of supervisory authority, public employees who harass coworkers generally do not do so under the color of state

law because they are not using or purporting to use state authority.  *Barfield v. Arizona*, CV-09-00864-PHX-FJM, 2010 WL 3719221, at *10 (Sept. 15, 2010) (citing circuit cases involving supervisory authority or lack thereof and acting under of color of state law).

Taking all of the above into consideration, and for reasons discussed below, the Court finds that viewing the undisputed material facts in the light most favorable to the nonmovant, Plaintiff has presented no evidence from which a reasonable jury could find that Defendant Gallegos invoked his power as a deputy sheriff or purported to exercise any power possessed by virtue of state law when he reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger.

### a.       **Horseplay or Intent Is Not Determinative**

As an initial matter, whether Defendant Gallegos was engaging in horseplay or, as Plaintiff alleges, Defendant Gallegos was angry and acted in retaliation and intentionally tased Plaintiff are not determinative in the Court's analysis because the § 1983 "under color of law" inquiry focuses not so much on *why* the perpetrator acted, but *how*.[13]  *Washington-Pope*, 979 F. Supp. 2d at 571 (explaining that if an individual is possessed of state authority and purports to act under the authority, his action is state action, and it is irrelevant that he might have taken the same action had he acted in a purely private capacity) (citing *Barna,* 42 F.3d at 816)); *see also Strange*, 1996 WL 733766, at *4 ("The under color of law determination does not turn on an individual's subjective understanding of an actor's conduct."); *Harris*, 94 F.3d at 198, n. 1 ("[r]egardless of whether the punch was accidental or intentional," the prison worker was not

---

[13] Similarly, whether Defendant Gallegos intended to display an "arc" warning, whether Defendant Gallegos's muscle memory took over when he pulled the electronic trigger mechanism of the X-2 Taser, and whether Defendant Gallegos was surprised and shocked when the X-2 deployed darts are not material facts determinative in the Court's analysis.

acting under color of state law when engaging in this purely personal dispute); *Basista v. Weir*, 340 F.2d 74, 80-81 (3d Cir. 1965) (explaining that even if the defendant's actions were in fact motivated by personal animosity that does not and cannot place him or his acts outside the scope of Section 1983 if he vented his ill feelings towards plaintiff under color of law); *Gomez*, 2017 WL 3736693, at *5 (finding that an officer who intentionally sprayed a fellow officer with pepper spray was engaged in a personal pursuit based on defendant's desire to retaliate against plaintiff for a perceived slight and that the officer was not acting under color of state law); *Neuens v. City of Columbus*, 275 F. Supp 2d 894, 901-02 (S.D. Ohio, Feb. 11, 2003) (explaining that an officer's intent is not the sole determinant of whether he acted under color of state law) (citing *Waters v. City of Morristown, TN*, 242 F.3d 353, 359 (6th Cir. 2001))).  Rather, the Court must examine the totality of the circumstances, and evaluate whether the officer was acting under color of state law based on his objective, visible conduct.  *Id.*

### b.      Plaintiff's But-For Argument

Additionally, Plaintiff's implicit suggestion that *but for* having to allow Defendant Gallegos into the sally port of the jail so he could transport inmates from the jail and *but for* Defendant Gallegos's position as deputy and carrying a Taser the incident would not have occurred is unavailing.  *David,* 101 F.3d at 1353 (stating that the Court must examine the nature and circumstances of the conduct to the performance of official duties); *see also Washington-Pope*, 979 F. Supp. 2d at 554 (rejecting plaintiff's argument that but for being forced to partner up with her fellow police officer and share a patrol car with him the incident would not have occurred because the case law established that it is an officer's purporting to exercise authority – some vestige, but not necessarily the whole cloth of which he possesses - that brings conduct under color of law, not the unfortunate coincidence of co-employment); *Strange*, 1996 WL

733766, at *4 (rejecting plaintiff's argument that but for the police officer's purported authority plaintiff would not have complied with the officer's request to give him his insurance file which prompted the fight that ensued). Instead, Plaintiff must provide evidence to create a genuine issue of material fact that Defendant Gallegos invoked his power as a deputy sheriff or purported to act under authority of law when he reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger. *Washington-Pope*, 979 F. Supp. 2d at 569.

Moreover, the question is not what Defendant Gallegos was doing five minutes or even ten seconds before the tasing incident occurred. *Id.* The question is the nature of the act Defendant Gallegos committed toward Plaintiff, at the moment in time he committed it. *Id.* Thus, the fact that Defendant Gallegos was performing a public duty when he drove to and entered the Detention Facility, or engaged in a verbal exchange with Plaintiff, even if related to how Defendant Gallegos was performing his public duties, are insufficient to bring his conduct under color of law. These manifestations of police authority are not per se determinants; rather they are potential indicators to help answer the question, even if circumstantially, actually at issue: whether the officer acted under pretense of law, such that the victim officer could have believed that he was acting with the imprimatur of the state – viz., whether the victim was intimidated by the perpetrating officer's official status.

### c. Defendant Gallegos Did Not Have Actual Authority Over Plaintiff

Plaintiff has failed to provide evidence from which a reasonable jury could infer that Defendant Gallegos had actual authority or power over Plaintiff. To the contrary, the undisputed material facts support that Defendant Gallegos had no actual authority or power over Plaintiff and that Plaintiff was not intimidated by Defendant Gallegos, as he argues. For instance, Defendant Gallegos and Plaintiff, while both Rio Arriba County employees, worked in different

departments of the criminal justice system.  Defendant Gallegos and Plaintiff reported to different supervisors.  And viewing the undisputed material facts in a light most favorable to Plaintiff, Plaintiff attested that he and Defendant Gallegos, having worked together for four years, were nothing more than work acquaintances, a characterization of their working relationship that undermines Plaintiff's argument that Defendant Gallegos had authority over him in the workplace.[14]

When Deputy Gallegos arrived at the detention center on June 3, 2019, at approximately 9:30 a.m., Defendant Gallegos approached the gate and beeped his horn a few times.  Plaintiff opened the gate to Defendant Gallegos.  After opening the gate, Plaintiff exited the side door and walked toward Defendant Gallegos as he pulled his vehicle forward to the sally port.  Plaintiff stood in close proximity to Defendant Gallegos when Defendant Gallegos exited his vehicle and opened the trunk.[15]  *Id.*  Plaintiff directed Defendant Gallegos to "stop beeping his fucking horn at my jail," a directive that on its face contradicts Plaintiff's argument that Defendant Gallegos had authority over him or that Plaintiff was intimidated by Defendant Gallegos.  *See generally Martinez*, 54 F.3d at 988 n.6 (noting that "the fact that [the victim] walked away numerous times shows that he was not 'so intimidated' by [the harassing officer's] status as a policeman 'as to cause him to refrain from exercising his legal right[s]'.") (quoting *Jones v. Gutschenritter*, 909 F.2d 1208, 1212 (8th Cir. 1990)); *see also Washington-Pope*, 979 F.2d at 568 (finding that behavior by the victim that suggests he was not intimated by the perpetrator's official status

---

[14] Plaintiff has presented no evidence that Defendant Gallegos or the Rio Arriba County Sheriff's Department hired him, trained him, determined his title/position, established his work responsibilities, set his salary, managed his schedule, evaluated his performance, recommended demotions or promotions, or had any authority to give Plaintiff orders, discipline Plaintiff, or terminate Plaintiff if he failed to do his job.

[15] Plaintiff disputes that he "closed distance" on Defendant Gallegos.  Doc. 31 at 5, ¶ 22.  The surveillance video footage depicts Plaintiff approaching Defendant Gallegos and standing in close proximity to the trunk of Defendant Gallegos's vehicle.  *See* Exhibit 2A at 9:32:46.

militates against finding that the perpetrator acted under color of law) (citing *Parrilla-Burgos*, 108 F.3d at 450-51; *Barna*, 42 F.3d at 818)).

Additionally, although Plaintiff argues that Defendant Gallegos had authority over him because Plaintiff risked discipline if he did not do his job, *i.e.,* opening the secured gate to Defendant Gallegos so he could pick up detainees and take them to court, Plaintiff has failed to present evidence to support that he risked discipline at the hands of Defendant Gallegos, or by the Sheriff's Department for that matter.[16]  Instead, the undisputed material facts demonstrate that after the tasing incident occurred Plaintiff reported it to *his administrator*, Larry DeYapp, the Administrator of the Detention Facility.  Doc. 31-2 at 2, ¶ 19.  In turn, Mr. DeYapp reported the incident to Defendant Lujan, who, exercising his authority over Defendant Gallegos, subsequently disciplined Defendant Gallegos by placing him on administrative leave and suspending his pay.  *Id.*; Doc. 21-1 at 4, ¶ 20.  Further, Plaintiff has presented no evidence that the Sheriff's Department *allowed* Defendant Gallegos to have access and control over him, as he argues, just by virtue of Plaintiff having to do his job opening the secured gate.[17]  Although it is undisputed that Plaintiff would not have allowed Defendant Gallegos into the sally port were Defendant Gallegos not a deputy sheriff, it is also undisputed that Plaintiff would not have allowed *anyone* to enter through the secured gate unless they were authorized to do so, *i.e., he* would not open the gate to a private citizen because the gate is a secured gate and strictly for law enforcement purposes.  Doc. 31-2 at 1, ¶ 2.  Given the undisputed fact that Plaintiff would not open the gate to *anyone* without the requisite authority to enter the Detention Facility, Plaintiff's

---

[16] *See* fn. 14, *supra.*  Even if the Court were to assume that Plaintiff risked discipline at the hands of his own supervisor for failing to do his job, Plaintiff has failed to provide evidence that Defendant Gallegos or the Sheriff's Department crafted, had influence over, or could impose any disciplinary policies Plaintiff may have been subjected to as an employee of the Detention Facility for failing to do his job.

[17] *See* fn. 14, *supra.*

argument implicitly suggests that *all* those who gained entrance necessarily exercised authority and control over him by virtue of Plaintiff's having to open the secured gate for them to enter. Plaintiff does not provide evidence to support such a broad suggestion and, more importantly, does not provide evidence that having to open the gate to Defendant Gallegos was a sole and narrow exception within the broader suggestion implicit in Plaintiff's argument.

In sum, Plaintiff has failed to provide evidence from which a reasonable jury could infer that Defendant Gallegos, or the Sheriff's Department, exercised actual authority and control over him just by virtue of his having to open the secured gate to allow Defendant Gallegos entry into the Detention Facility.

### d.   Defendant Gallegos Did Not Have De Facto Authority Over Plaintiff

Plaintiff also has failed to provide evidence that Defendant Gallegos exercised de facto authority over Plaintiff. *See generally David*, 101 F.3d at 1354 (finding that section 1983 sexual harassment claim may not be dismissed for failure to state claim upon which relief may be granted because "in some instances co-employees may exercise *de facto* control over sexual harassment victims such that they act under color of law."); *see also Rouse v. City of Milwaukee*, 921 F. Supp. 583, 588 (E.D. Wis. 1996) (finding there were no facts to support plaintiff's de facto authority argument where evidence demonstrated officers had same rank and defendant had no authority to give plaintiffs orders).  In his affidavit, Plaintiff states that he "knows from his observations of Defendant Lujan and his deputies that Defendant Lujan runs a 'Sheriff's Department that he believes it can act above the law'"[18] [sic].  Doc. 31-2 at 4, ¶ 34. Additionally, in Count IV of his Complaint, Plaintiff alleges that "Sheriff Lujan created a work

---

[18] Notably, Plaintiff did not include this statement from his Affidavit as part of his "Additional Undisputed Material Facts" in his Response.  *See* Doc. 31 at 6-7.

environment ripe for male-on-male sexual harassment by cultivating a culture of toxic masculinity between himself and county employees."[19]  Doc. 1-1 at 9, ¶ 79.  Plaintiff attached two exhibits to his Response in support of his allegations, *i.e.*, a Criminal Complaint against Sheriff Lujan dated nine and a half months after the incident at issue here, and a lapel camera video depicting the incident which was the cause of Sheriff Lujan's arrest, occurring approximately eleven months after the incident at issue here.[20]  Doc. 31-2 at 4, ¶ 36.  Plaintiff states that Defendant Gallegos is depicted in the lapel camera video "standing by" as Defendant Lujan violated the law.  *Id.*  To the extent Plaintiff is suggesting that these post-incident events involving Defendant Lujan's allegedly illegal behavior serve as material evidence that Defendant Gallegos had de facto authority over Plaintiff *nine/eleven months earlier* when the tasing incident occurred, the Court is not persuaded.  As an initial matter, the exhibits are not relevant to the period of time at issue here.  That aside, even if the Court were to assume that Plaintiff's characterization of Defendant Lujan and his allegedly lawless management of the Sheriff's Department were true, Plaintiff has presented no evidence that links Defendant Lujan's allegedly unlawful post-incident actions to what occurred between Plaintiff and Defendant Gallegos nine/eleven months earlier.  As previously stated, Plaintiff has presented no evidence of violent, harassing, or lawless behavior by Defendant Gallegos, or any other Rio Arriba County deputy sheriff, toward Plaintiff or any other county employee either in the four years Plaintiff and Defendant Gallegos worked together prior to the tasing incident.  Further, Defendant Gallegos's "standing by" as his supervisor, Defendant Lujan, was allegedly obstructing service of a search

---

[19] Similarly, Plaintiff did not include this statement from his Complaint as part of his "Additional Undisputed Material Facts" in his Response.  *See* Doc. 31 at 6-7.

[20] These attached exhibits are the subject of a Motion to Strike filed by Defendants.  Doc. 51.  Because the Court is granting summary judgment as to Plaintiff's § 1983 claims, the Court does not address the merits of Defendants' Motion to Strike.

warrant eleven months after the incident at issue here is too attenuated a link to support that

Defendant Gallegos had de facto authority over Plaintiff and/or that Plaintiff was intimidated by

him eleven months earlier.  In sum, Plaintiff has failed to present any specific factual support

from which a reasonable juror could impute Defendant Lujan's post-incident actions onto

Defendant Gallegos and conclude that Defendant Gallegos exercised de facto authority over

Plaintiff when the tasing incident occurred.  *Pueblo Neighborhood Health Centers, Inc.*, 847

F.2d  at 649 (a plaintiff cannot rely upon conclusory allegations to defeat summary judgment but

rather must produce some specific factual support of its claim).

        e.        **Defendant Gallegos Did Not Purpose to Act in an Official Capacity or To Exercise Official Responsibilities Pursuant to State Law When He Tased Plaintiff**

Lastly, in considering Defendant Gallegos's conduct at the moment the tasing actually

occurred, though the indicia of authority could certainly compel the conclusion that Defendant

Gallegos was acting under color of state law, *i.e.,* he was on duty, in uniform, and he deployed

his state-issued X-2 Taser, this case differs from typical cases because here the parties were both

state actors conducting their official duties as co-workers.  *See Pitchell*, 13 F.3d at 548 (finding

that police officers exercise actual and apparent authority over civilians that they do not exercise

over their co-workers and that an officer is less likely to act under "pretense of law" vis-à-vis his

fellow officers); *see also Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992)

("courts have generally declined to find liability under § 1983 against a co-worker unless the

harassment involved an abuse of authority"); *Barfield,* 2010 WL 3719221, at *10 ( in the

absence of supervisory authority, public employees who harass coworkers do not generally do so

under the color of state law); *Mutluturk v. City of Springfield, Florida*, 5:20cv179-TKW-MJF,

2020 WL 5757508, at *2 (N.D. Fla. Aug. 24, 2020) ("If the altercation [between two officers]

seems to be of a distinctively personal nature, it can generally be assumed that the aggressor's

official trappings, without more, will not lead the victim to believe that the aggressor is acting

with the imprimatur of the state and, in turn, to forego exercising his legal rights").[21]   Here,

Plaintiff has presented no evidence that when Defendant Gallegos reached for his X-2 Taser,

pointed it at Plaintiff's groin, and pulled the trigger, that he invoked authority as a sheriff,

flashed his badge, directed or ordered Plaintiff to take any action based on his authority as a

sheriff, issued any official warnings, pursued Plaintiff, threatened Plaintiff, enlisted other deputy

officers to assist him, or attempted to arrest Plaintiff.   Additionally, Plaintiff has presented no

evidence that at the moment Defendant Gallegos reached for his X-2 Taser, pointed it at

Plaintiff's groin, and pulled the trigger that he was acting in accordance with police regulation or

that Defendant Gallegos's use of the X-2 Taser on Plaintiff was related to the performance of his

police duties.   *See Martinez*, 54 F.3d at 987 (viewing the facts in context did not indicate that

officer's actions were in any meaningful way related either to his official status or to the

performance of his police duties); *see also Strange*, 1996 WL 733766, at *4 (finding that for the

defendant officer to be acting under the "pretense" of authority his actions must be meaningfully

related to his governmental status or the performance of his duties as a police officer); *Barna*, 42

F.3d at 817 (noting that off-duty officers did not invoke their police authority and alleged assault

did not occur as a result of official police concerns); *Pitchell*, 13 F.3d at 548 (explaining that off-

duty officer was not acting in accordance with police regulation or invoking authority of police

department when he used his personal weapon to shoot a guest in his home); *Gomez*, 2017 WL

---

[21] On September 24, 2020, Plaintiff appealed the district court's ruling to the Eleventh Circuit.  Plaintiff's argues that whether a law enforcement officer acts under color of law when the officer violates another law enforcement officer's Fourth Amendment rights at the workplace is a question of first impression in the Eleventh Circuit, and that there is a circuit split requiring resolve, *i.e., Cassady* and *Martinez.  See* Plaintiff's Civil Appeal Statement, USCA11, Case 20-13585 (filed Oct. 8, 2020).

3736693, at *5 (finding that the allegations failed to show that the defendant officer fundamentally invoked his power as an officer and did not purport to exercise any power (real or pretended) possessed by virtue of state law when he sprayed his fellow officer with pepper spray); *Molera*, 2013 WL 4804292, at *5 (finding that tasing a subordinate officer is undisputedly outside the scope of sergeant's official duties); *Washington-Pope*, 979 F.2d at 565-68 (citing cases involving police-on-police altercations wherein courts found officers were not acting under color of state law where the conduct at issue was not related to their duties and powers inherent in the officers' jobs).   In other words, Plaintiff has failed to provide evidence to create a genuine issue of material fact that Defendant Gallegos's tasing of him was accompanied by the "indicia of state action" necessary to establish conduct under color of law.  *Gomez,* 2017 WL 3736693, at *5 (*citing Washington-Pope*, 979 F. Supp. 2d at 568).  To the contrary, the undisputed material facts demonstrate that Plaintiff and Defendant Gallegos, both state actors and work acquaintances, had a brief verbal exchange about not beeping a car horn and ownership of the jail while conducting their official duties in the workplace, during which Defendant Gallegos laughed, and then, without more, reached for his X-2 Taser, pointed it at Plaintiff's groin, and pulled the trigger.  This purely private altercation between Plaintiff and Defendant Gallegos, therefore, does not possess the necessary indicia of authority to find that Defendant Gallegos was acting under color of law.

 **F.**  **Plaintiff's 42 U.S.C. § 1983 Claims**

   **1.**  **Counts I and IV Against Defendant Gallegos**

 Having viewed the undisputed material facts in a light most favorable to Plaintiff, and for the reasons discussed above, the Court finds there is no evidence from which a reasonable jury could find that Plaintiff has met his burden of establishing the existence of a real nexus between

Defendant Gallegos's conduct and his badge of state authority in order to demonstrate the action was taken under color of state law and meant to deprive Plaintiff of his secured constitutional rights. *Jojola,* 55 F.3d at 493. As such, Plaintiff cannot demonstrate a necessary element of a constitutional violation and his claims must fail. Although Defendant Gallegos's conduct was at the very least impulsive and irresponsible and at the very most reprehensible and tortious, it was not under color of law. A remedy, if any were to be had, might lie in state court, but "'[i]t is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Mark*, 51 F.3d at 1150. There being no genuine dispute as to any material fact, Defendants are entitled to summary judgment as a matter of law as to Plaintiff's Counts I and IV.

## 2. Counts III and V Against Rio Arriba County and Sheriff Lujan

Tenth Circuit law instructs that a municipality will not be held "liable [for constitutional violations] when there is no underlying constitutional violation by any of its officers." *Olsen v. Layton Hills Mall*, 312 F.3d 104, 1317-18 (10th Cir. 2002) (quoting *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir.1993)). Similarly, a county or sheriff in his official capacity cannot be held "liable for constitutional violations when there was no underlying constitutional violation by any of its officers." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (citing *Olsen,* 312 F.3d at 1317–18 (internal quotations marks and brackets omitted). Because Plaintiff has failed to establish that Defendant Gallegos acted under color of law when he tased Plaintiff, Defendants are entitled to summary judgment as to Plaintiff's Counts III and V.

G.     **Plaintiff's State Law Claims**

Finally, in addition to his alleged constitutional claims, Plaintiff also alleges state law claims of battery and loss of consortium under the New Mexico Tort Claims Act.  The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  Nonetheless, the Court may decline supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Tenth Circuit has indicated that if, prior to trial, "all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims."  *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1237-39 (10th Cir. 2020) (reversing a district court for failing to decline supplemental jurisdiction).

Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court.  *Huntsinger v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims).  Further, the Supreme Court has indicated that in a removed case, like the instant case, remand is often preferable to dismissal without prejudice in order to "best promote the value of economy, conveniences, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353, 108 S.Ct. 614 (1988).

Accordingly, the Court is declining supplemental jurisdiction over the claims arising under state law and will remand them to state court.

## IV.  **CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion for Summary Judgment

(Qualified Immunity Raised) on Plaintiff's 42 U.S.C. § 1983 claims - Counts I, III, IV and V - is

well taken and is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's state law claims are remanded to the First

Judicial District Court, Rio Arriba County, New Mexico.

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding By Consent**

48